# UNITED STATES *v.* STONE & DOWNER COMPANY

## ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF CUSTOMS APPEALS.

No. 150.   Argued February 24, 1927.—Decided May 16, 1927.

1. A judgment of the Court of Customs Appeals deciding the classification of goods and the duty upon their importation is not *res judicata,* estopping the Government, upon another importation of the same kind of goods by the same importer.   P. 230.
2. This rule was established by the Court of Customs Appeals during the years succeeding its creation when its jurisdiction over such customs cases was exclusive and final, and for that reason and

because of the wisdom of the rule as applied to the peculiar subject matter, this Court upholds it.　P. 235.

3. In par. 18 of the Emergency Tariff Act of May 27, 1921, imposing duties on " wool, commonly known as clothing wool," the term " clothing wool " is to be interpreted in its natural and usual meaning of wool used in making clothing and not in its commercial or trade meaning of wool used in the carding process, as distinguished from that used in the combing process, in the making of yarn. P. 237.

4. The rule giving controlling weight to commercial or trade meanings of words designating particular kinds of goods in tariff acts, is but an aid in ascertaining the intent of Congress and must yield where the words used and the history and manifest object of the provision show clearly that other meanings were intended.　Pp. 239, 247.

5. In this instance, the words " commonly known as," evince an intention to adopt the common meaning of " clothing wool," in accord with the purpose of Congress to protect the wool market in this country and increase the revenue, while acceptance of the trade meaning of " clothing wool " would permit combing wool, constituting one-half of the wool of which clothing is made, to be imported free of duty, in defeat of that purpose.　P. 248.

6. Testimony of expert witnesses is admissible to prove the ordinary meaning of the terms " clothing wool," and " carpet wool," used in a tariff classification.　P. 245.

12 Cust. Appls. 557, reversed.

CERTIORARI (269 U. S. 542) to a judgment of the Court of Customs Appeals which affirmed the Board of General Appraisers, G. A. 8842, 46 T. D. 142, in classifying certain importations of wool in the fleece and in yarn and in cloth as entitled to free entry, under the Tariff Act of October 3, 1913, and as not subject to duty as "clothing wool" and manufactures thereof, under paragraphs 18 and 19 of the Act of May 27, 1921.　The judgment of the Board sustained protests of the importers against assessments made by the collector under the latter enactment.

The importations in this case were nine in number. In a previous case, not reviewed here, there were thirteen. See 12 Cust. Appls. 557; G. A. 8613; T. D. 141.　The

issue was exactly the same in both cases, except that the thirteenth importation in the first case was conceded by all parties to come within pars. 18 and 19. By error, the opinion originally filed treated the second case as involving the same number of importations. A petition for rehearing was submitted and denied, but the error as to the number of importations was corrected by order of Court, October 10, 1927.

*Mr. William W. Hoppin,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* and *Assistant Attorney General Lawrence* were on the brief, for the United States.

*Mr. Edward P. Sharretts* for respondents.

Congress in prior tariff acts has recognized the classification of wool into clothing wool, combing wool and carpet wool. Tariff Act of 1867, c. 197, 14 Stat. 559; Tariff Act of 1883, c. 121, 22 Stat. 488; Tariff Act of 1909, 38 Stat. 11. If it has been its purpose to designate wool used in the manufacture of wearing apparel, it is obvious that the term "clothing wool" would have been the last term adopted, knowing as it must be presumed Congress did know, its legislative history and the fact that this particular term was in general common use among those to whom the law was directed, and who would necessarily have to conduct their business under it.

The mere fact that the term is widely used, discussed and defined in official publications of the federal government, would in itself leave no doubt as to what Congress understood to be its scope and meaning. As late as May 26, 1924, the Treasury Department in a regulation required importers to classify clothing wool and combing wool separately on their customs entries. Cf. T. D. 40217 (45 Treas. Dec. 670); *United States* v. *Buffalo Nat. Gas Fuel Co.,* 78 Fed. 110; aff'd 172 U. S. 339; *Merck* v.

*United States,* 6 Ct. Cust. Appls. 32.   Obviously the commercial understanding could not be excluded without excluding the only meaning in which the term is ever understood or used.   The union of these various sources in a common definition simply established what already existed. *Swan* v. *Arthur,* 103 U. S. 597.   Raw wool because of its very nature exists only as an article of commerce.   Laws imposing duties upon imported merchandise are intended for practical use and application by men engaged in commerce and presumably are drafted in language understood by those to whom they are necessarily directed. *In re Two Hundred Chests of Tea,* 9 Wheat. 438; *Elliott* v. *Swartout,* 10 Pet. 137; *United States* v. *Davies,* 11 Ct. Cust. App. 392; *Cooper* v. *Dobson,* 157 U. S. 148; *United States* v. *Hopewell,* 51 Fed. 798.

If the phrase " usually known," in the provision involved in *Cooper* v. *Dobson* did not make the meaning of the term " combing wool " ambiguous, there is no reason why the synonymous phrase " commonly known " should make the same term ambiguous in the present enactment.

Even where the terms of an act are obscure or ambiguous, this Court has never authorized an indiscriminate search for intent through the journals of the legislature. *Duplex Co.* v. *Deering,* 254 U. S. 443; *Pennsylvania R. Co.* v. *International Coal Co.,* 230 U. S. 184.   It must be presumed that the assessment of duty on clothing wool met the emergency just as Congress intended that it should, and provided the intended protection, and that an assessment of duty on " combing wool " was not deemed necessary or expedient in order to accomplish the purpose. *Chung Fook* v. *White,* 264 U. S. 443; *United States* v. *Citroen,* 223 U. S. 407; *Pennington* v. *Coxe,* 2 Cr. 33.

It is useless for petitioner to attempt to show that it was the policy of the Government to include what the statute omits. *United States* v. *First Nat. Bank,* 234 U. S. 245.

Even if there was no good reason why combing wool should have been omitted, that would not constitute a reason for its being interpolated by the Court. *Bates Ref. Co.* v. *Sultzberger,* 157 U. S. 1. The rule against enlarging the subject-matter of a statute by judicial interpretation has been applied with great particularity in the case of statutes levying taxes including customs duties. *Eidman* v. *Martinez,* 184 U. S. 578; *Gould* v. *Gould,* 245 U. S. 151; *United States* v. *Merriam,* 263 U. S. 179; *Partington* v. *Atty. Gen.,* L. R. 4.

If the present question were one of doubt, the doubt would be resolved in favor of the importer. *American Net Twine Co.* v. *Worthington,* 141 U. S. 468; *Hartranft* v. *Weigmann,* 121 U. S. 609; *Benziger* v. *United States,* 192 U. S. 38.

The doctrine of *res judicata* has a clear application to the case at bar.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is a proceeding by certiorari to review the judgment of the Court of Customs Appeals in the classification for duty of nine importations of wool in the fleece, one of cloth and one of yarn. 12 C. Cust. App. 557. The certiorari was granted by this Court October 12, 1925, 269 U. S. 542, a certificate of importance by the Attorney General under § 195 of the Judicial Code, as amended August 22, 1914, c. 267, 38 Stat. 703, having been filed in the Court of Customs Appeals before the case was decided in that court.

A similar case between the same parties, involving the same questions and importations of similar merchandise, was decided adversely to the Government by the Court of Customs Appeals on November 17, 1923, *Stone &*

*Downer Co.* v. *United States,* 12 Court of Customs Appeals Reports 62; 45 Treasury Decisions 167, T. D. 40019. In that case, however, there was no certificate of importance filed by the Attorney General, and no application was made for a writ of certiorari.

The case as now presented to this Court involves two questions.

First, Is the judgment of the Court of Customs Appeals, in November, 1923, involving the same customs classification an estoppel by *res judicata* against the Government?

Second, If it does not so operate, was the Court of Customs Appeals right in holding that the importations of wool herein are entitled to come in as wool of the sheep under the Tariff Act of October 13, 1913 (c. 16, 38 Stat. 114), and not as clothing wool under paragraph 18 of the Emergency Tariff Act of May 27, 1921 (c. 14, 42 Stat. 9, 10)?

First Question. It is settled in this Court that the general rule by which a judgment estops the parties in future litigation between them, to question either a fact or a point of law necessary to the first judgment and adjudicated therein, applies to cases of taxation as well as to other subjects of litigation. This was decided in the case of *New Orleans* v. *Citizens' Bank,* 167 U. S. 371. That was a tax suit, and the issue was whether the judgment of a court of competent jurisdiction, in holding that the Citizens' Bank had exemption by contract from certain taxation, was *res judicata* and estopped the city from attempting to enforce subsequent taxes contrary to the same exemption. The Court, through Mr. Justice White, said (p. 396):

"The proposition that because a suit for a tax of one year is a different demand from the suit for a tax for another, therefore *res judicata* can not apply, whilst admitting in form the principle of the thing adjudged, in

reality substantially denies and destroys it.  The estoppel resulting from the thing adjudged does not depend upon whether there is the same demand in both cases, but exists, even although there be different demands, when the question upon which the recovery of the second demand depends has under identical circumstances and conditions been previously concluded by a judgment between the parties or their privies."

This is not the rule in a number of the States.  *City of Newport* v. *Commonwealth,* 106 Ky. 434; *Louisville Bridge Co.* v. *City of Louisville,* 81 Ky. 189; *Bank* v. *Memphis,* 101 Tenn. 154; *State* v. *Bank,* 95 Tenn. 221, 231; *Georgia Railroad & Banking Co.* v. *Wright,* 124 Ga. 596, 603; *Michigan Southern, etc. R. R.* v. *People,* 9 Mich. 448, 450; *L. S. & M. S. R. R.* v. *People,* 46 Mich. 193, 208; *C. B. & Q. R. R.* v. *Cass County,* 72 Neb. 489, 491; *Adams* v. *Yazoo & Miss. R. R.,* 77 Miss. 194, 266; *State* v. *American Sugar Refining Co.,* 108 La. 603.  Judge Cooley in his work on Taxation, 8th ed., says, at pages 2648–9, that the state courts, differing from this Court, do not generally regard an adjudication as to taxes for one year as making the decision of the supporting points *res judicata* for the following years.

We have held that where, in a federal court, a judgment of a state court in a tax case is pleaded in a subsequent tax case arising in a federal court, the estoppel from the judgment of the state court will not be given greater effect than it would have in the state court, and that a judgment not operating as *res judicata* in suits for taxes for another year in the state court will not be an estoppel in a federal court for subsequent years. *Phoenix Fire and Marine Insurance Co.* v. *Tennessee,* 161 U. S. 174; *Covington* v. *First National Bank of Covington,* 198 U. S. 100.

The question here differs from that presented in ordinary tax suits, and involves the effect of an adjudication

of a peculiar character. Prior to the passage of the Mc-Kinley Tariff Administrative Act, approved June 10, 1890 (c. 407, 26 Stat. 131, 136, § 12), litigation over the collection of duties and the classification of importations under tariff acts was carried on by suits against the collectors who imposed the duties and was in the form of an action against the collecting official as an individual. After the judgment was obtained, the collecting officer was relieved from personal obligation and the judgment was paid from the Treasury of the United States. See U. S. Rev. Stat., §§ 3009–3014. In 1890, new machinery was introduced by which a board of nine general appraisers was created which, sitting in divisions of three, constituted in a sense administrative courts of appeals to pass on questions of classification and the imposition of duties; and appeals were allowed from it to the proper circuit court of the United States, whence, upon an allowance of an appeal by the circuit court, the cases came to this Court. By the Act of 1891, creating circuit courts of appeals (26 Stat. 826, c. 517, § 6), these cases went by appeal to those courts, and then by certiorari to this Court. By the Tariff Act of August 5, 1909 (36 Stat. 11, 105, § 29), another change was made by which appeals from the decisions of the Board of General Appraisers were allowed to a new court created by the act, called the Court of Customs Appeals, and by that act the whole question of classification and refunding of duties was taken out of the jurisdiction of the regular federal judiciary. The classification by the Court of Customs Appeals was made final, and no appeal was granted to this Court. This independent plan for the settlement of tariff questions, and the complete finality of the decisions of the Court of Customs Appeals in that field of litigation, lasted until August, 1914, when, by the Act of August 22 of that year (c. 267, 38 Stat. 703), a limited review by writ of certiorari was given to this Court of judgments of the

Court of Customs Appeals, in cases in which the construction of the Constitution, or any part thereof, or any treaty made pursuant thereto, was drawn in question, and in any other case when the Attorney General of the United States should, before the decision of the Court of Customs Appeals was rendered, file with the court a certificate that the case was of such importance as to render expedient its review by this Court. For five years, however, the Board of General Appraisers and the Court of Customs Appeals between them exercised complete jurisdiction in the construction of tariff acts and the determination of the amount due as duties from every importation coming into the country. By the Act of 1909 (36 Stat. 105) the court was given power " to establish all rules and regulations for the conduct of the business of the Court and as might be needful for the uniformity of decisions within its jurisdiction as conferred by law." It was by the law to exercise exclusive appellate jurisdiction in all cases as to the construction of the law and the facts respecting the classification of merchandise and the rate of duty imposed thereon under such classification, and the fees and charges connected therewith, and all appealable questions as to the jurisdiction of the Board of General Appraisers, and all appealable questions as to the laws and regulations governing the collection of the customs revenues; and the judgment or decrees of said Court of Customs Appeals were made final in all such cases. (p. 106). It was thus for five years put in a position where it must not only make its own rules, but it must determine, as a practical matter, what should be the conclusive effect of its own judgments in the determination of questions of fact and statutory construction and classification, in subsequent cases brought before it by the same parties and presenting similar issues. In the exercise of this jurisdiction, it established the practice that the finding of fact and the construction of the statute and classification

thereunder, as against an importer, was not *res judicata* in respect of a subsequent importation involving the same issue of fact and the same question of law.

In *Beuttell & Sons* v. *United States,* 8 U. S. Court of Customs Appeals Reports, 409, the question was whether machine-made Wilton rugs were dutiable under par. 300 of the Tariff Act of 1913, or under par. 294 by virtue of par. 303 of that act. In delivering the opinion of the court, Judge Barber, who has been a member of the court since its organization, in 1909, used this language:

"At the outset it should be noted that the precise issue here has been before and decided by this court in *Beuttell & Sons* v. *United States* (7 Ct. Cust. Appls., 356; T. D. 36905). The Government, being of opinion that such issue, which was there decided adversely to its contention, ought again to be here considered, and following a recognized practice in customs litigation, has made up a new record, which for practical purposes results as a retrial of the former case."

It is clear that this has been the practice since the beginning of the court. See *Stone & Downer Co.* v. *United States,* 4 U. S. Court of Customs Appeals, 47. In *United States* v. *Hearst Company,* 49 Treasury Decisions, 854, T. D. 41584, the court said:

"Precisely the same kind of merchandise was under consideration in *Hearst & Company* v. *United States,* 12 Court of Customs Appeals, 81; T. D. 40021. The record of the evidence in that case is incorporated in this and it is agreed that this case is, in effect, a retrial of the issues involved in that upon additional testimony introduced on behalf of the government, none having been offered by it in the earlier case."

Provision for just such rehearings was made in the rules of procedure and practice adopted by the Board of General Appraisers (35 Treasury Decisions, 113, Rule 22) as follows:

"Where a question of the classification of imported merchandise is under consideration for decision by any one of the boards and the decision has been previously made involving the classification of goods of substantially the same character, the record and testimony taken in the latter case may, within the discretion of the board, be admitted as evidence in the pending case on motion of either the Government or the importer or on the board's own order: Provided, That either party may have any one or more of the witnesses who testified in such case summoned for re-examination or cross-examination as the case may be. The rule shall, furthermore, apply to the printed records which may have been acted on by the courts in the case of appeals taken from the decisions of the board."

There would seem to be an analogy between the proper respect of this Court for the conclusion of the Court of Customs Appeals upon the question of the estoppel of its own decisions, when it was an independent court not subject to review by this Court, and our respect for judgments of the state courts, in limiting the application of the estoppel of their decisions in tax cases, and unless some controlling reason exists why we should overrule the established practice in this matter of the Court of Customs Appeals, now that the power of review of some of its judgments has been given us, we should follow it.

We think that, not only was it within the power of the Court of Customs Appeals to establish the practice, but that it was wise to do so. The effect of adjudicated controversies arising over classification of importations may well be distinguished from the irrevocable effect of ordinary tax litigation tried in the regular courts. There of course should be an end of litigation as well in customs matters as in other tax cases; but circumstances justify limiting the finality of the conclusion in customs controversies to the identical importation. The business of importing is carried on by large houses between whom and

the Government there are innumerable transactions, as here for instance in the enormous importations of wool, and there are constant differences as to proper classifications of similar importations. The evidence which may be presented in one case may be much varied in the next. The importance of a classification and its far-reaching effect may not have been fully understood or clearly known when the first litigation was carried through. One large importing house may secure a judgment in its favor from the Customs Court on a question of fact as to the merchandise of a particular importation, or a question of construction in the classifying statute. If that house can rely upon a conclusion in early litigation as one which is to remain final as to it, and not to be reheard in any way, while a similar importation made by another importing house may be tried and heard and a different conclusion reached, a most embarrassing situation is presented. The importing house which has, by the principle of the thing adjudged, obtained a favorable decision permanently binding on the Government will be able to import the goods at a much better rate than that enjoyed by other importing houses, its competitors. Such a result would lead to inequality in the administration of the customs law, to discrimination and to great injustice and confusion. In the same way, if the first decision were against a large importing house, and its competitors instituted subsequent litigation on the same issues, with new evidence or without it, and succeeded in securing a different conclusion, the first litigant, bound by the judgment against it in favor of the Government, must permanently do business in importations of the same merchandise at great and inequitable disadvantage with its competitors.

These were doubtless the reasons which actuated the Court of Customs Appeals when the question was first presented to it to hold that the general principle of *res judicata* should have only limited application to its judg-

ments.    These are the reasons, too, why the principle laid down by this Court in the decision already referred to, in *New Orleans* v. *Citizens' Bank,* 167 U. S. 371, should not apply or control.    There, the thing adjudged was the existence of an immunity of the property of a bank from taxation, due to a contractual obligation of the state or city government to the bank,—a personal relation which might without embarrassment and with much more safety be permanently fixed for one tax payer than a question of fact or law affecting discriminatingly one of a whole class of importers and giving the exceptional operation in its favor of a general tariff on articles of merchandise largely imported.    The fact that objection to the practice has never been made before, in the history of this Court or in the history of the Court of Customs Appeals in eighteen years of its life, is strong evidence not only of the wisdom of the practice but of general acquiescence in its validity.    The plea of *res judicata* can not be sustained in this case.

Second question.    Paragraph 18 of the Emergency Tariff Act of May 27, 1921, c. 14, 42 Stat. 9, 10, under which the wool was classified for duty herein, is as follows:

" Wool, commonly known as clothing wool, including hair of the camel, angora goat, and alpaca, but not such wools as are commonly known as carpet wools: Unwashed, 15 cents per pound; washed, 30 cents per pound; scoured, 45 cents per pound.    .    .    ."

Paragraph 19 is as follows:

" Wool and hair of the kind provided for in paragraph 18, when advanced in any manner or by any process of manufacture beyond the washed or scoured condition, and manufactures of which wool or hair of the kind provided for in paragraph 18 is the component material of chief value, 45 cents per pound in addition to the rates of duty imposed thereon by existing law."

The respondents claim, and the Court of Customs Appeals held, that all but one of these importations in the

fleece were entitled to free entry under par. 650 of the free list of the Tariff Act of October 3, 1913, c. 16, 38 Stat. 114, 164, as follows:

"650.   Wool of the sheep, hair of the camel, and other like animals, and all wools and hair on the skin of such animals, and paper twine for binding any of the foregoing.   . . ."

and that yarn of the importations was dutiable only under par. 287, p. 142, as follows:

"287—Yarns made wholly or in chief value of wool, 18 per centum ad valorem."

Wool clothing is made from wool yarn prepared either by the carding process or by the combing process.   The adaptability of the raw wool for one or the other is determined chiefly by the length of the staple, so that wools used for clothing are often described in the trade as short wools or long wools.   The exact question is whether paragraph 18 includes in the term clothing wool, long staple or combing wool as well as short staple or carding wool. They are both used in clothing.   Carpet wools are ordinarily not used for clothing.   They are generally too coarse for that purpose but are well adapted and generally used for the making of carpets.   They are not grown in the United States, so that there is no motive for putting a tariff on them to protect domestic growers or the home markets.

In the case between the same parties, presenting the same issues in 1923, the Board of General Appraisers by a majority of two to one gave judgment for the Government.   *Stone & Downer Co.* v. *United States*, 43 Treasury Decisions, 141, T. D. 39473.   One held that the words "wool commonly known as clothing wool" must be given their ordinary non-trade meaning of wool used for clothing, and therefore included both carding and combing wools.   His view was that evidence of the technical or commercial meaning of clothing wool was not relevant and

was excluded by the words " commonly known as." The other General Appraiser, supporting the Government view, examined the evidence at length and found from it that the first great division among wools was between clothing wools and carpet wools, and that while, in the trade, clothing wools were divided into and were distinguished commercially as clothing wools and combing wools, the expression " commonly known as clothing wool," as testified by competent witnesses of large experience, included wool for clothing, whether treated by the carding or combing process.

The Customs Court, on appeal, held that if there was a trade term to determine classification under a tariff act, the overwhelming weight of authority showed that it must prevail over the ordinary meaning if different, and that under this rule of construction clothing wool was wool used in the carding process, as distinguished from that used in the combing process, in the making of cloth. *Stone & Downer Co.* v. *United States,* 12 Court of Customs Appeals Reports, 62.

When the case now in hearing came before the Board of General Appraisers, the Board unanimously gave judgment for the importers, following the previous judgment of the Court of Customs Appeals on the same issues in the case presented in 1923, and this action was affirmed by the Court of Customs Appeals. *United States* v. *Stone & Downer Co.,* 12 Court of Customs Appeals Reports, 557. The record contains all the evidence in the first case, and the new evidence introduced by the Government in the second case, in accord with Rule XXII of the Board of General Appraisers, already referred to.

In this case, as in every other involving the interpretation of a statute, the intention of Congress is an all important factor. The greatest light is thrown on that intention in this case by an examination of the existing conditions and the anticipated evils against which by this legislation Congress sought to protect the country.

When the Emergency Tariff Act was passed, we had been through the greatest war of history and were attempting to return to peace conditions, and had reached a time, in 1920, when business was bad and financial disaster threatened. The result of the Congressional elections in November, 1918, was to change the political complexion of the House and Senate. Before that Congress finished its term, in the winter of 1920–1921, an emergency tariff bill was introduced to relieve the agricultural depression which was at hand. Such a bill went through Congress, but was vetoed. The National administration changed on the succeeding 4th of March, 1921. With a new Congress and new Executive, another emergency tariff bill like the one already vetoed was introduced. The Committee on Ways and Means of the new House of Representatives, in recommending the passage of the bill (1 House Reports, 67th Congress, 1st Session, page 1), commented on the serious obstacles to the revival of industry in the paralysis of agriculture. It pointed out that the purchasing power of the farmers had been in large part destroyed and must be restored, and called attention to the fact that we were in the grip of a nation-wide industrial and business depression, and that agriculture was hardest hit.

Coming then to the subject of wool, as one of the agricultural products needing legislative aid, the report said:

"(1) In previous years the average production of wool in the United States was 314,000,000 pounds and average imports 203,000,000 pounds.

" During the war imports increased in response to increased manufacturing to about 445,893,000 pounds in 1919, and declined to 259,618,000 pounds in 1920.

"(2) Both importation and consumption of wool have decreased since May. However, there has been a large increase for January and February, 1921. Importations

in recent months appear to be speculative, in anticipation of tariffs.

"(3) The stocks of wool on hand were large when the price slump came last May. To the stocks on hand was added the new clip of 280,000,000 pounds.

"(4) The accompanying tables show the wool supply in sight to be near 1,000,000,000 pounds. The normal consumption is about 600,000,000 pounds, with about 400,000,000 pounds carried as stock. A year's supply is in sight at normal consumption. At the present rate of consumption (about two-thirds normal) the supply would be sufficient for a year and a half.

"(5) The effect of an embargo or high tariff would be to gradually increase the prices.

" The justification for an emergency tariff is:

"(a) A fundamental industry that it takes years to develop is facing ruin.

"(b) The prosperity of large numbers of people, not sheep growers, is dependent on the sheep industry. Hence, merchants and bankers who have made large advances to sheep producers are in serious financial trouble and favor a wool tariff.

"(c) At present the supply of wool in the United States is approximately 650,000,000 pounds, of which 175,000,000 pounds is held by the producers. With the coming 1921 wool clip the amounts controlled by producers would be approximately 450,000,000 pounds, while the dealers would hold approximately 500,000,000 pounds. Therefore, the benefit derived from a tariff would be equally divided between producers and the dealers and manufacturers. Undoubtedly any tariff on wool would reflect in the price of finished goods and the charge passed on to the consumer.

"(d) Wool dealers who purchased wool stocks at higher prices than now obtain are in serious financial straits and would be directly benefited. Forced liquida-

55514°—28——16

tion on the part of wool dealers would make the present. bad situation worse and break a trade organization of value to agriculture.

"(e) It can be shown that the price of wool is so small a factor in the ultimate cost of manufactured goods that no large burden need be placed on the consuming public."

The same report was adopted without change by the Finance Committee of the Senate in recommending the bill to that body. 1 Senate Reports, 67th Congress, 1st Session, page 6. The bill passed both Houses and was approved May 27, 1921.

The situation as set forth in the Ways and Means Report, as to the wool market of the World in 1921, was confirmed in a pamphlet issued by the United States Tariff Commission at Washington in 1922, on "Recent Tendencies in the Wool Trade," in which it said (p. 1):

"For the pre-war years 1909 to 1913, inclusive, the world's annual production of raw wool averaged approximately 3,335,242,000 pounds, of which about 30 per cent. was carpet wools. Of this amount 587,350,000 pounds were produced in South America, 157,761,000 in South Africa, and 903,620,000 in Australasia, the three great exporting regions which supply the deficiencies *in production of clothing wools of western Europe and North America.* For 1921, world production is estimated at 2,770,852,000 pounds, of which the three exporting regions above mentioned are credited with 491,269,000 pounds, 127,177,000 pounds and 798,443,000 pounds, respectively, or a decline in these areas of 231,000,000 pounds from pre-war production." (The italics are ours.)

The Emergency Tariff Act, so designated by its terms, was Title I of the law of Congress of May 27, 1921, c. 14, which as a whole was entitled:

"An Act Imposing temporary duties upon certain agricultural products to meet present emergencies, and to

provide revenue; to regulate commerce with foreign countries; to prevent dumping of foreign merchandise on the markets of the United States; to regulate the value of foreign money; and for other purposes."

The Emergency Tariff Act imposed for the period of six months from the date of the Act, May 27, 1921, a tariff on the following articles: wheat, flour, flax seed, corn and maize, beans, peanuts, potatoes, onions, rice, lemons, vegetable oils, sheep, beef, veal, mutton and lamb, cotton and manufactures of cotton, in its paragraphs 18 and 19 on wool, on sugars, butter, cheese, milk, wrapper and filler tobacco, apples, cherries, olives.

Title II directed an investigation into the question whether any industry of the United States is likely to be injured by dumping of foreign goods upon our markets at less than market value. It provided for a special dumping duty and a means of determining what that should be, and it made that title the Anti-Dumping Act.

Title V provided for an increased duty on dyes and chemicals, which title was to be known as the Dye and Chemical Control Act.

The whole act was directed to protecting the markets of the United States from being swamped by importations from abroad, and to increasing the revenue. Congress proposed to keep the wool market free from demoralization in the interests of the wool growers of the country, on the one hand, and the owners of wool stocks on hand in the country, on the other.

It was asserted in the argument on behalf of the Government, and the assertion was acquiesced in by counsel for the importers, that at least half in weight and value of the importations of wool from which clothing is made is combing wool. The contention of the importers in this case, if successful, would therefore bring about the result that half, both in weight and in value, of the foreign wool in competition with wool produced in the

United States and with the stocks of wool on hand in the United States, would not be kept out of its markets by the emergency tariff at all, and that the swamping of the domestic wool markets to that extent would continue under the free importation of combing wools. More than this, such combing wools as would come in under the emergency tariff, if construed as the Government contends, would produce as much revenue as the carding wools, and yet, by the importers' construction that revenue would be lost.

If the language of the statute is such that such results can not be avoided, of course it must be enforced accordingly. If Congress by its language has made a mistake, and so has failed in its purpose, this Court can not supply by its decision the omission of a necessary legislative provision to effect its purpose. With the intent of the Act clearly in mind, however, we must see whether it is true that the language used can only bear the construction insisted upon by the importers and upheld by the Court of Customs Appeals, or whether there is a broader and more reasonable construction that can be fairly placed upon the statute which will serve the plain Congressional purpose.

From the 500 pages of the evidence, we find that, in the custom of the trade, the term "clothing wool" applies to the short staple wool which is suitable for carding and which goes into what is known as the woolen or felting process for making cloths of that character, and the term "combing wool" refers to wool of longer staple which goes into another process known as combing for making worsted cloths; that in the trade, clothing wool and combing wool are thus contrasted; second, that originally the worsted process could not be used with the fine wools like the merino wools, because the staple was not long enough; but that the development of combing machinery, particularly what is called the French

combing process, has enabled manufacturers to comb wool of shorter staple than formerly, and to make it into worsteds; and that, in addition to this, cross breeding between the merino and other wools has increased the length of the staple and the amount of available combing wools as compared with the carding wools, so that the border line between the use of combing wools for clothing and that of carding wool has changed; that the definitions in the principal dictionaries and encyclopedias set forth the same trade distinction between clothing wool and combing wool, as between manufactures of wool, and manufactures of worsteds; that both clothing wool and combing wool are largely grown in this country.

The expert witnesses of the importers generally testified that there was no other meaning for clothing wool but carding wool. There was other substantial evidence, however, from expert witnesses for the Government, of large experience in dealing in wool, who testified that, speaking generally, and in ordinary parlance, wools were divided into clothing wools and carpet wools with reference to their chief use, and that it was only in the trade in the grading and sorting of wools and in their purchase and sale that the term clothing wool was distinguished from combing wool. The competency and relevancy of such evidence as to the ordinary meaning of language in tariff classifications is sustained by the decision of this Court in *Robertson* v. *Salomon*, 130 U. S. 412, 415.

The natural and usual meaning of the words " clothing wool " is wool for clothing. That is what the non-expert reader of the words would understand until he was advised of a different meaning by reason of the language of the trade. When, therefore, the words are used " *commonly known as* clothing wools," the ordinary inference from the collocation of the words is that they refer to wool that is used in making clothing. If Congress had intended that the words " clothing wool " should have their commercial

designation, it would simply have used the words without qualification or it would have said "commercially known as." It would not have used the phrase "*commonly known as.*" The phrase indicates not only that clothing wool is used in its ordinary or non-expert meaning, but is to serve the same purpose as the same phrase in connection with carpet wools, in the same clause, by indicating that, while these wools were capable of use for other than clothing and carpets, respectively, they were to be classified by reference to their chief use.

In the world view which the committee report shows clearly that the Congress was taking of the wool market, it was not dealing with the processes by which wool was made into cloth, and distinguishing between them. If it had wished to make a distinction based on the process of manufacture rather than on the material which was to be used, it certainly would not have included, as expressly within the operation of paragraph 18, the hair of the camel, the angora goat and the alpaca; for in preparing those materials for the making of cloth the hair is always combed and never carded. It had chiefly in mind, as shown by the contrast made in paragraph 18, the distinction between wool which was made into carpets and could not be grown in the United States, and wool made into clothing which could be, and was, grown in the United States and in England and on the continent and in South America, Australasia and South Africa. The world view of the production of wools which affected Congress in enacting this legislation is also revealed in the passage from the Tariff Commission report, which we have already quoted, where it refers to South America, South Africa and Australasia as "the three great exporting regions which supply the deficiencies in production of clothing wools of western Europe and North America." This use of the words "clothing wools" of course is used only in contrast to the carpet wools which together with the cloth-

.ing wools embrace the whole world production. We do not find it difficult, therefore, in our interpretation of paragraph 18 to give effect to the evident purpose of Congress.

We are confronted by counsel for the importers with the language to be found in many of our own cases giving controlling effect in classification of merchandise for duty in tariff acts to trade terms and commercial usage. It is these cases also upon which the Court of Customs Appeals relied in reaching its conclusion. Their principle has nowhere been more strongly stated than by Mr. Justice Gray in the case of *Cadwalader* v. *Zeh,* 151 U. S. 171, 176:

" It has long been a settled rule of interpretation of the statutes imposing duties on imports, that if words used therein to designate particular kinds or classes of goods have a well known signification in our trade and commerce, different from their ordinary meaning among the people, the commercial meaning is to prevail, unless Congress has clearly manifested a contrary intention; and that it is only when no commercial meaning is called for or proved, that the common meaning of the words is to be adopted."

This statement is supported by a long line of authorities, one of which is *Robertson* v. *Salomon,* 130 U. S. 412, 415, in which Mr. Justice Bradley used the following language:

"The commercial designation, as we have frequently decided, is the first and most important designation to be ascertained in settling the meaning and application of the tariff laws. See *Arthur* v. *Lahey,* 96 U. S. 112, 118; *Barber* v. *Schell,* 107 U. S. 617, 623; *Worthington* v. *Abbott,* 124 U. S. 434, 436; *Arthur's Executors* v. *Butterfield,* 125 U. S. 70, 75. But if the commercial designation fails to give an article its proper place in the classification of the law, then resort must necessarily be had to the common designation."

What we hold here is that Congress, by using the expression " commonly known as clothing wool," indicated expressly its intention not to give to the expression " clothing wool" the commercial designation that it has when used in contrast with combing wool, and that the history of the legislation shows that the trade or commercial meaning is contrary to the purpose of Congress in the enactment of the law.  In other words, the authorities upon which the Court of Customs Appeals proceeded we think have no application to the interpretation of this act, save as they recognized that in the last analysis effect must be given to the intention of Congress.

It should be noted that the tariff division of wools in 1867 was of three classes.  Class 1—Clothing wool, wools which are of merino blood and wools of like character. Class 2—Combing wool, wools which are of the English blood; and the hair of the alpaca, goat and other like animals.  Class 3—Carpet wools and other similar wools. These divisions were continued in the Tariff Act of 1883. In the Tariff Act of 1890 and in the Act of 1897, when the duties on wool were restored after the free wool of the Tariff Act of 1894, the division was made into three classes, while the tariff divisions between clothing and combing wools were dropped.  Again, in the Act of 1909, there was a division of three classes without reference to the trade division between clothing and combing wools.

There may have been other reasons for this change in the acts of 1890, 1897 and 1909, but there were two, already referred to, which were obvious, one arising from the cross breeding of sheep, so that the staple in the merino and like wools was lengthened thereby (see par. 380 of the McKinley Act, c. 1244, 26 Stat. 595), and the other in the improvement in the combing process, so that short wools of the merino blood which before could only be carded and not combed, became combing wools in the

trade sense and could be used for worsteds as well as for woolen cloths. The merino wools were finer wools; and as they became subject to combing by breeding and mechanical process, their use in making clothing was enlarged and their value was enhanced. See Report of the Tariff Commission on the Wool Growing Industry 1921—pages 428, 448. The result of these changes was that the first class of wools in the acts of 1890, 1897 and 1909, included many combing wools, while the first class under the Act of 1883 was expressly designated as clothing wools. This is illustrated in this case, in which the wools here imported are partly merino wools by the blood and come from South America, and yet twelve of the importations out of thirteen are combing wools, while the thirteenth was declared doubtful by the experts and was held to be a clothing wool by the Court of Customs Appeals.

A similar change, after 1890, took place in the lessening of importance from a tariff standpoint of the trade distinction between manufactures of wool, the product of carding wool, and manufactures of worsted, the product of combing wool; for while the names of woolens and worsteds were retained in the tariff acts from 1890 on, these were usually classified together for the same duty.

In holding as we do in this case that the plain purpose of Congress requires the interpretation of the words in their ordinary rather than their commercial or trade meaning, we find full support in a case which was not cited in the opinions of the courts below or in the briefs of counsel on either side. We refer to the case of *United States* v. *Klumpp,* 169 U. S. 209. That case turned on paragraph 297 of the Wilson-Gorman Tariff Act of 1894, 28 Stat. 509, c. 349, passed in Mr. Cleveland's administration, to take the place of the McKinley Tariff Act of 1890, 26 Stat. 567, c. 1244. The new Act applied to all imports from the date of its passage, August 27, 1894, except merchandise covered by paragraph 297 which read as follows:

" The reduction of the rates of duty herein provided for manufactures of wool shall take effect January first, eighteen hundred and ninety-five."

The contention of the Government in that case, which both the District Court and the Circuit Court of Appeals had upheld, *Murphy* v. *United States,* 68 Fed. 908, 72 Fed. 1008, was 'that, under the language of the McKinley Act and the previous tariff acts for a great many years, manufactures of wool and manufactures of worsteds were separate subjects of importation, and that paragraph 297 postponing the reduction of duties on manufactures of wool, did not apply to manufactures of worsteds. It had been expressly decided by this Court in *Seeberger* v. *Cahn,* 137 U. S. 95, 97, that cloths popularly known as diagonals, and in the trade as worsteds, were subject to duty under the Act of March 3, 1883, as manufactures of worsteds and not as manufactures of wool. It was admitted that the merchandise in controversy was worsted dress goods made from the fleece of the sheep, which had been combed and spun into worsted yarn, and paid a high duty under the McKinley Act. By the Act of May 9, 1890, it was provided that worsted cloths should be classified as, and with, woolen cloths, 26 Stat. 105, c. 200. That, however, seems to have been repealed by the McKinley Act (*Murphy* v. *United States,* 72 Fed. 1008, 1009), but though the words wool and worsted continued to be used separately throughout the McKinley Act in description of the various materials for dress goods, they were classified together for duties. There was no doubt about the commercial or trade meaning of manufactures of wool as distinguished from manufactures of worsteds, a distinction which exists today in all woolen and clothing markets. This Court, however, in view of the evident purpose of Congress in the paragraph in question, found that there was no imperative ground for the reinstatement of that trade distinction between manufactures of wool and those of worsted, in construing paragraph 297, although the two terms continued to be

used separately in the McKinley and in the new Act of 1894. Referring to paragraph 297 and its words "Manufactures of Wool," the Court said (p. 215):

"The reason for the postponing of the taking effect of the reduction of duties obviously had nothing to do with the process of manufactures, but related to the material of which the goods were composed, which material had been relieved from duty by paragraph 685 of the act.

"Congress undoubtedly concluded that the manufacturers of goods from wool had laid in a large stock of material, which equitably they should be allowed a reasonable time to work off, and that there was probably on hand a large stock of goods, to dispose of which reasonable time should be allowed, rather than that the large dealers should be induced to bring in foreign goods at a cost which involved ruinous competition; while at the same time the wool growers ought to have their original market until they could adjust themselves to the new condition of things.

"The specific rate was compensatory, and, when stricken out, and the duty on raw material abolished, a postponement was provided for in order to avoid injustice.

"But the reason for postponing the reduction on manufactures of wool, which, on the face of the act, we think properly imputable to Congress, is as applicable to worsted goods as to any other goods fabricated from wool."

And the opinion concludes:

"We think that the words 'manufactures of wool,' in paragraph 297, had relation to the raw material out of which the articles were made, and that as the material of worsted dress goods was wool, such goods fell within the paragraph."

We think the *Klumpp* case very like the one at bar. They both consider the same trade distinction between different clothing wools growing out of the different processes used in the manufacture of the yarn, and reject its application because of Congress's purpose. In both cases

the trade distinctions had ceased to be important from a tariff standpoint, and classification was made on a different basis from that of carding or combed wools, or woolen cloth and worsted cloth. The trade distinctions were very important in the transaction of business, but not in the fixing of duties.

This Court was able, from the language and the circumstances in the *Klumpp* case, as it is here, to determine what the purpose of Congress was in the use there of the words "manufactures of wool," as in the words here, "wool commonly known as clothing wool." Seeing clearly that purpose, this Court held, in the *Klumpp* case, as it holds here, that the case came within the exception to the general rule for the use of trade terms in interpreting tariff acts. The exception was stated by Mr. Justice Gray in *Cadwalader* v. *Zeh, supra*—that " the commercial meaning is to prevail unless Congress has clearly manifested a contrary intention; and that it is only when no commercial meaning is called for or proved, that the common meaning of the words is to be adopted "; and by Mr. Justice Bradley in *Robertson* v. *Salomon, supra,* where he says, after stating the general rule, " but if the commercial designation fails to give an article its proper place in the classifications of the law, then resort must necessarily be had to the common designation." In other words, the pole star of interpretation of statutes, whether it be of tariff acts or any other, must be the intention of Congress, when that can be clearly ascertained and is reasonably borne out by the language used.

Neither in the briefs presented to us nor in the opinions of the courts below has there been a suggestion of a reason why Congress should have distinguished, in its attempt to avoid the demoralization of the wool markets in this country and to increase the revenue, between carding wool and combing wool. The only argument of the Court of Customs Appeals is, *ita lex scripta est;* and

the answer to the argument must be, that it is not so written and that the language is easily capable of being construed in accordance with the Congressional intention.

What we have said leads to the conclusion that we must reverse the Court of Customs Appeals.

*Reversed.*

---

MR. JUSTICE McREYNOLDS is unable to discern any satisfactory answer to the forceful opinion by the Court of Customs Appeals, and thinks that its judgment should be affirmed. In his view, they rightly accepted the statute as written by Congress; the contrary course would have required them to usurp the functions of a legislator and desert those of an expounder of the law.

Nearly one hundred years ago Mr. Justice Story announced the fundamental doctrine which no court should forget. "Arguments drawn from impolicy or inconvenience ought here to be of no weight. The only sound principle is to declare, *ita lex scripta est,* to follow, and to obey. Nor, if a principle so just and conclusive could be overlooked, could there well be found a more unsafe guide in practice than mere policy and convenience."