UNITED STATES *v.* F. S. WHELAN (No. 3778)[1]

United States Court of Customs and Patent Appeals, December 3, 1934

*Joseph R. Jackson*, Assistant Attorney General (*John F. Kavanagh* and *Ralph Folks*, special attorneys, of counsel), for the United States.

*Elisha Hanson* (*Eliot C. Lovett* and *George N. Dale* of counsel) for appellee.

[Oral argument October 1, 1934, by Mr. Folks and Mr. Hanson]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, and GARRETT, Associate Judges[2]

GARRETT, Judge, delivered the opinion of the court:

Certain paper invoiced as "standard newsprint paper," imported through the port of Detroit, Mich., in rolls having a width of 15¾

[1] T. D. 47244.
Lenroot, J., did not participate in this case.

inches, was classified by the Collector of Customs at that port under paragraph 1401, Tariff Act of 1930, and assessed with a duty of one-fourth of 1 cent per pound plus 10 per centum ad valorem.

The pertinent part of the paragraph reads:

PAR. 1401. Uncoated papers commonly or commercially known as book paper, and all uncoated printing paper, not specially provided for, not including cover paper, one-fourth of 1 cent per pound and 10 per centum ad valorem; * * *

Protest was filed, the claim being made that the paper is admissible duty free under paragraph 1772 of said act, a paragraph of title II, the free-list schedule, reading:

PAR. 1772. Standard newsprint paper.

The United States Customs Court sustained the protest and the Government appeals to this court.

There is no substantial controversy with regard to the facts.

During the month of May 1931, upon an order of the Cincinnati (Ohio) Enquirer for "1290 tons of newsprint," 44 cars of paper were imported. One of these cars, containing 27 tons, comprised the paper here involved. The rolls of paper in the other 43 cars, all of which were admitted duty free, ranged in width from 35½ inches to 71 inches. The paper involved was of the same type and quality in all respects, except in one dimension, as the other paper, and was used by the Enquirer in printing the magazine and comic sections of its regular Sunday editions. The only difference in the paper which was taxed and those papers which were admitted duty free was the difference in size—to be exact the difference in width.

In making the assessment of duty the Collector of Customs appears to have been guided, at least in part, by T. D. 40996, 47 Treas. Dec. 844, wherein the Secretary of the Treasury, revoking a prior ruling contained in T. D. 39778, 44 Treas. Dec. 99, promulgated what purports to be a definition of "standard newsprint paper" in the following terms:

The term "standard newsprint paper" as used in paragraph 1672 of the tariff act of 1922 shall conform to the following specifications:

*Weight.*—500 sheets, each 24 by 36 inches, shall weigh not less than 30 pounds nor more than 35 pounds.

*Rolls.*—The paper shall be in rolls not less than 16 inches wide and 28 inches in diameter. Sheets 20 by 30 inches.

*Stock.*—Not less than 70 per cent of the total fiber shall be ground wood; the remainder shall be unbleached sulphite.

*Finish.*—The average of 5 tests in machine direction and 5 tests in cross direction on both sides moving the paper after each test, made with the Ingersoll glari-meter, shall be not more than 50 per cent gloss.

*Ash.*—Shall be not more than 2 per cent.

*Degree of sizing.*—Time of transudation of water shall be not more than 10 seconds by the ground-glass method or 5 seconds by the alternate methods.

In a subsequent portion of said T. D. 40996, it was said:

Paper not falling within the above definition is not entitled to admission free of duty as standard newsprint paper under paragraph 1672 [Tariff Act of 1922].

It may be here said that paragraph 1772 of the Tariff Act of 1930 is in the exact language of paragraph 1672 of the Tariff Act of 1922. Prior to the 1922 act the test fixed by statute with reference to the free admission of newsprint paper was that of price. For reasons satisfactory to it Congress, in the 1922 act, changed the language.

The history of the legislation was set forth in this court's opinion in *Crown Willamette Paper Co.* v. *United States*, 16 Ct. Cust. Appls. 431, T. D. 43187, and need not be repeated here in full. It was said in that case that "Congress intended to free-list that class of paper upon which newspapers are printed" and also that "The testimony in this case supports the conclusion that 'standard newsprint paper' is only such paper as is chiefly used for printing newspapers." This court further said, citing *United States* v. *Stone & Downer Co. et al.*, 274 U. S. 225, 244:

When the Congress has clearly indicated the purpose and expected resulting effect of a tariff provision, customs officials and the courts, on construing the same, will so apply and so construe it as to bring about such purposes, unless the language used is such as to render a contrary result unavoidable.

It may be remarked that in the *Crown Willamette Paper Co.* case, *supra*, this court held that certain rolls of paper "known as side runs cut from standard newsprint paper," were not admissible duty free as standard newsprint paper under the Tariff Act of 1922, because, on account of the small sizes of the papers, they were not used for printing newspapers. The rolls of papers there involved were respectively 10⅞ inches long by 12 inches wide and 9 inches long by 6 inches wide, and were shown to have been used for the printing of pencil tablets, small circulars, wrapping paper, sales books and pads, duplicate bills of lading, and other manufactures of low-grade paper.

In the report of the Committee on Ways and Means which accompanied the bill that became the Tariff Act of 1922, when that measure was submitted by that committee to the House of Representatives, it was said:

The paper schedule removes from the dutiable list wood pulp of all kinds and standard newsprint. The designation of standard newsprint is a new term, but thoroughly understood both in the trade and in the customs office. It is that form of print paper upon which newspapers are printed. The American consumption both of pulp and standard newsprint is greatly in excess of our production. It is therefore logical, in the interests of conservation and suitable supply, that these articles should be upon the free list. Sufficient authority is given the President to protect American interests should any discrimination be shown against us by foreign nations.

Subsequently the Senate committee, in reporting the same bill to the Senate, said in its report:

Your committee has adopted the policy of the House bill in recommending the free entry of mechanical wood pulp and standard newsprint paper.

In the case of *United States* v. *James P. Heffernan Paper Co.*, 17 C. C. P. A. (Customs) 61, T. D. 43358, this court had occasion again to examine and construe the language "Standard newsprint paper," as used in paragraph 1672 of the Tariff Act of 1922. The question of dimension was not there involved and the paper was held not entitled to free entry because it was not shown to have been chiefly used for printing newspapers. The opinion states:

The record shows that the paper is used for box and trunk linings, pen and ink tablets, cheap writing paper, catalogues, order blanks, and general job printing, such as posters, handbills, circulars, and dodgers, and the Government contends that the record shows that this is its chief use. A number of the exhibits are colored.

This court there held it error to apply the doctrine of suitability for use, "in view of the history of the printing paper paragraphs of the last half century," but indicated clearly that had the record shown that the chief use of the paper was for printing newspapers it would have been held duty free as standard newsprint paper.

Both the *Crown Willamette Paper Co.* and the *Heffernan Paper Co.* cases, *supra*, arose under the Tariff Act of 1922. This court did not find it necessary in either case to discuss the question of time in relation to the proof of chief use.

In the latter named case, we gave some attention to T. D. 40996, *supra*, saying:

As to the validity of, or the force and effect to be given to, T. D. 40996, under this record, we need say no more than that if it would tend to prevent the free entry of a *grade* of printing paper chiefly used for printing newspapers to that extent it would be invalid. No one will contend that the Secretary of the Treasury has any authority to legislate. *United States* v. *Monroe-Goldkamp Co.*, 15 Ct. Cust. Appls. 26, T. D. 42135. If, however, for the purpose of carrying out the provisions of the act, he has provided proper tests and standards for quickly determining what standard newsprint paper is, we can see where it would be helpful to the customs officials in classification. But, such regulations must not extend or limit the provisions of the statute contrary to the intent of the legislature. It seems to us that the question as to whether imported paper is standard newsprint paper, under the rule laid down by this court, is a question which is susceptible of proof ("grade" not italicized in original).

The Government has assigned numerous errors here, but, in the final analysis, the only issue in the case seems to grow out of the size of the paper involved. It is one-fourth inch narrower than the minimum width (16 inches) prescribed in T. D. 40996, *supra*.

It is conceded that, except as to width, the paper involved is identical with the paper imported by appellee during the month of May, 1931, in the other 43 cars above alluded to, and classified by the

collector as standard newsprint paper entitled to free entry. Furthermore, it is established that the particular importation involved was actually used in the printing of a part of several editions of the Enquirer. This use, however, was in 1931, and the Government insists that it has not been shown that the chief use of paper only 15¾ inches wide was for printing newspapers prior to and about the time of the passage of the Tariff Act of 1930.

The record discloses the use of rotary presses, particularly in the printing of modern metropolitan daily newspapers, and the utilization of rolls of paper of different widths, the rolls generally used being designated as full rolls, three-quarter rolls, half rolls and quarter rolls. The designations "full," "three-quarter," "half" and "quarter" apparently have no reference to the sizes of the rolls, the length of the paper, or the amount of paper contained in the roll, but relate solely to the matter of width.

Papers printed upon rotary presses are based on multiples of two pages. If it be desired to print an eight-page paper, full rolls are used—that is, rolls having a width sufficient to make four pages, side by side, of the desired width of page, and the print is made on both sides in the same operation. If it be desired to print a ten-page paper, use is made of full rolls and one-quarter rolls, in combination. For a 12-page paper, full rolls and half rolls are used, in combination, and for a 14-page paper, full rolls and three-quarter rolls are utilized, in combination. Combinations of rolls for multiples of these numbers of pages are made as required, according to the press equipment of the plant in which the printing is done.

Uniformity in the width of the pages of the finished newspaper is secured by maintaining the correct proportion of width in the different rolls. If, for illustration, the full roll is of paper having a width of 71 inches, the three-quarter roll has a width of 53¼ inches, the half roll a width of 35½ inches and the quarter roll a width of 17¾ inches.

In the case at bar one of the lots of paper imported and classified as standard newsprint paper, duty free, consisted of 3 cars (83 tons) of rolls having a width of 63 inches, and, as has been stated, the importation involved comprised 1 car (27 tons) of rolls having a width of 15¾ inches, which is precisely one fourth the width of the 63-inch wide rolls. As has also been indicated, the testimony is undisputed that the 15¾-inch rolls were used in printing parts of the magazine and comic sections of certain Sunday editions of the newspaper for which the importations were made, the use being in May and June 1931.

It was testified, in substance, by Mr. J. S. O'Neal, who had charge of the ordering of newsprint paper for the Enquirer, that, at the time of the importation, the newspaper was using for its "black and white" section, papers of a width of 71, 51¾ [53¾ ?] and 35½ inches, respec-

tively (that is, full rolls, three-quarter rolls and half rolls); that for the comic and magazine sections, 63-inch and 31½-inch widths, respectively (that is, full rolls and half rolls), were being used, the sections printed from these latter being of 24 pages; that it was decided to reduce these sections to 20 pages; that for 20-page sections the quarter roll, or 15¾-inch width, was desirable, and that the order was made for it "to start in with," quarter rolls of this dimension not having previously been utilized.

Objection was made to the line of testimony by Government counsel at the time it was presented, and its admission by the trial court is assigned as error before us. This assignment was not pressed in the oral argument, however, and is not mentioned in the brief. We presume it to have been abandoned. In any event, we do not regard its admission as constituting error, the courts, of course, being the judges of its relevancy and value.

The theory upon which the protestant in this case has proceeded throughout is that T. D. 40996 is, to quote from the brief in its behalf, "violative of the law." In effect, it is argued that through the literal application of its dimensional provisions, paper which in fact is chiefly used for the printing of newspapers will be denied free entry in contravention of the obvious intent of Congress.

In oral argument it was pointed out that there is evidence in the record which shows that numerous fluctuations in the sizes of the individual pages of newspapers have taken place and are taking place; that the publishers of a paper may conclude to change its style in a manner which necessitates changes in page sizes, and the argument is made that, as of course, the width of the individual newspaper page determines the desirable width of the rolls to be used in printing the paper. Further, it is argued that the dimensions—especially that of width prescribed in T. D. 40996, *supra*—inevitably would have a tendency to prevent, or at least discourage, changes, except within very restricted limits.

The position of the Government with respect to T. D. 40996, *supra*, is stated in the brief as follows:

The Government contends that the regulations in question were advisory only; that the usual presumption attached to the correctness of the classification by the collector; that the so-called Treasury Regulations are merely advisory and not at issue at all in this case; and that the presumption of the correctness of the classification has not been overcome by the importer.

In other words, the Government, as we interpret its brief and the oral argument in its behalf, taken as a whole, does not contend that a literal application of the dimensional provisions of the so-called regulation—which we, in fact, consider to be a departmental definition rather than a regulation as the word "regulation" is commonly understood—is, in all instances, required; that it (the definition) is,

however, sufficient if the widths and other elements of imported papers therein mentioned come within its terms, but that, independent of it, where the collector classifies an importation as not falling literally within its provisions, the burden rests upon the importer to overcome the presumption of correctness attaching to such classification, by showing that the chief use of the very sized paper involved was for printing newspapers at and prior to the passage of the Tariff Act of 1930.

In our opinion, the result for which the Government here contends would defeat what, we think, was the clear intent of Congress. It is not doubted that Congress intended to have paper chiefly used for the printing of newspapers admitted duty free. The reasons for this are clearly stated in the report of the Committee on Ways and Means, quoted *supra*, and no technical rules of construction should be invoked to defeat clear legislative intent. Congress itself said nothing of size in the statute, and there is no statutory definition of the term.

That the paper here involved belongs to a class chiefly used for the printing of newspapers is obvious, and the statement of this court in the *Crown Willamette Paper Co.* case, *supra*, already once quoted herein, is that "Congress intended to free-list that *class* of paper upon which newspapers are printed." (Italics not quoted.) The involved paper is shown to have been of the exact width requisite for use in combination with 63-inch rolls, under the technical method of rotary-press printing which has been described, and is shown to have been, in fact, so used. Its texture and composition were the same as the texture and composition of the wider rolls with which it was combined in use, and the individual pages of the finished section of the paper printed upon it were obviously of the same dimensions as the pages printed upon the wider rolls, admittedly entitled to free entry and so classified.

Two cases decided by the United States Customs Court, and not appealed, are of interest as showing the view taken with respect to the binding effect of certain provisions, other than size, of the regulation or definition, T. D. 40996, *supra*. These are the cases of *F. W. Myers & Co.* v. *United States*, T. D. 41827, 50 Treas. Dec. 370, and *McQuiddy Printing Co.* v. *United States*, reported in Abstract 14044, 58 Treas. Dec. 1151.

The judgment of the United States Customs Court is *affirmed*.

### DISSENTING OPINION

HATFIELD, Judge: The collector held that the imported paper was not "standard newsprint paper." Accordingly, the burden was upon the importer to establish that the importation belonged to a class of paper chiefly used for the printing of newspapers, at the time of, or immediately prior to, the enactment of the Tariff Act of 1930.

The only evidence in the case on that question is that the imported paper was actually used in the printing of magazine and comic sections of the Sunday editions of the Cincinnati Enquirer, and that it was similar in quality, but not in width, to "standard newsprint paper."

The use to which the imported merchandise was put is wholly insufficient to establish that it belonged to a class of paper chiefly used for the printing of newspapers. See Goldsmith's Sons v. United States, 13 Ct. Cust. Appls. 69, T. D. 40932.

It is clear from the record that the collector's decision was based largely, if not entirely, upon the width of the imported paper. That is to say, he held that paper of the width of that here involved was not chiefly used for the printing of newspapers. It seems clear to me that proof directed merely to the quality and use of the immediate importation, does not meet the issue raised by the collector's classification. Accordingly, I am of opinion that the judgment should be reversed.