(C. D. 908)

Nippon Import & Trading Co. et al. v. United States

United States Customs Court, Second Division

(Decided January 10, 1945)

*Barnes, Richardson & Colburn* (*J. Bradley Colburn* of counsel) for the plaintiffs. *Paul P. Rao*, Assistant Attorney General (*Joseph E. Weil*, special attorney), for the defendant.

*Joseph F. Lockett, amicus curiae.*

Before Tilson, Kincheloe, and Ekwall, Judges; Ekwall, J., concurring in the result

Kincheloe, Judge:  These protests relate to certain floor coverings imported from Japan, which were classified and assessed for duty by the collector under paragraph 921 of the Tariff Act of 1930, as "Rag rugs, wholly or in chief value of cotton, of the type commonly known as 'hit-and-miss'," at the rate of 75 per centum ad valorem, and which are claimed to be dutiable under the catch-all provision of the same paragraph for "all other floor coverings, including carpets, carpeting, mats, and rugs, wholly or in chief value of cotton," at the rate of 35 per centum ad valorem.

The contention of the plaintiffs is that all of the "hit-and-miss" cotton floor coverings in these importations whose length is three times or more its width are commercially known in the trade of this

country as "runners" and not as "rugs," and that therefore they are excluded from the provision of paragraph 921 for "hit-and-miss" cotton rag rugs, and are relegated to said catch-all provision for dutiable classification.

The definition of the word "rug" is given in Funk & Wagnalls New Standard Dictionary, 1930 edition, as follows:

> rug, n. 1. A heavy textile covering for a floor, differing from a carpet in that it is properly made in one piece, commonly with a shaggy pile, and of a size to cover only a portion of a floor.

The same authority gives the definition of the word "runner" as follows:

> runner, n. 20. A long narrow rug, as for a hallway.

The definition of "runner" appears in Webster's New International Dictionary, 1936, as follows:

> runner, n. 6. A long, narrow strip of material, as of roofing, carpeting, etc. Specif.: a Among Oriental rugs, a long narrow carpet, generally woven in pairs, used on either side of the kali (which see) in a Persian room, or as a divan cover. b Hence, any rug adapted by its long and narrow shape for running, or extending, along halls, passageways, etc.

Upon the trial it was stipulated between counsel herein that the merchandise in the present case is the same in all material respects as that in the case of *Nippon Import & Trading Co., Inc.* v. *United States*, 8 Cust. Ct. 18 (C. D. 575), affirmed in *United States* v. *Nippon*, 30 C. C. P. A. 89 (C. A. D. 220), in that the length of the rugs in both cases is three times or more than its width, that the rugs are of the type commonly known as "hit-and-miss," are composed of rags, and are wholly or in chief value of cotton. Thereupon, on motion of counsel for the plaintiffs the record in the said *Nippon* case, *supra*, was incorporated as a part of the record herein, the parties, the merchandise, and the issue therein being the same as in the instant case. Plaintiff then rested its case.

In view of the fact that in the incorporated case we went thoroughly into the evidence and law embodied in that record, we deem it very important here to quote at length from our opinion in same, as follows:

> The rule of commercial designation is well illustrated by the case of *Neuman & Schwiers Co.* v. *United States*, 24 C. C. P. A. 127, T. D. 48606, wherein the following language was used by the court:

>> We have pointed out, on numerous occasions, and did so again in the *Wile* case, *supra* [T. D. 47327], what the true rule was. This conclusion was based upon a uniform line of authorities from the beginning of the consideration of such cases by the courts of this country. The Supreme Court, in the very early consideration of these matters, as in the noted case of *Two Hundred Chests of Tea*, 9 Wheat. 428, recognized that customs laws were particularly adapted for use by merchants, and that it might well be that commodities which were well known among those who were engaged in the trade, under a certain designation might not be so known, by those who were not engaged in trade; that the Congress was to be understood as speaking in terms of the trade; and that if an article, although not commonly known as designated by the law, was uniformly, definitely, and generally known by that designation in the trade and commerce of the country,

it should be included within the statutory term. This rule has been carried down through the years, continuously. * * *.

On the issue thus presented plaintiff called as its first witness Isaac Davis, vice president and salesman of the importing company since 1924. His testimony is to the effect that he is in charge of the sales of the plaintiff corporation, Nippon Import & Trading Co., and has been buying and selling floor coverings since 1911; that he has personally sold "hit-and-miss" floor coverings such as exhibit 1 in different sizes all over the country to resident buyers, general stores, etc., at wholesale since 1923 (R. 8, 9, 13); and that he has come into contact with buyers and the trade generally, and is familiar with the trade usage and phraseology (R. 9). The witness further testified that at and before June, 1930, there was a trade understanding of the term "rug" in the cotton "hit-and-miss" floor covering trade which was definite, uniform, and general (R. 9), and that such meaning was different from the common or dictionary meaning, and was as follows:

The term "rug" as used in the cotton rag "hit and miss" floor covering trade included all floor coverings of any shape or form, finished on all sides, but did not include floor coverings where the length is three or more times greater than the width, which was known and sold as runners (R. 14).

and that such trade understanding does not include merchandise like exhibit 1, which is always sold and offered for sale as "runners," and is never sold or offered for sale as rugs (R. 15), and that the same thing applies to the "hit-and-miss" floor coverings measuring 27 by 90 inches (R. 16).

On cross-examination Mr. Davis named some of the people to whom he sold "hit-and-miss" floor coverings as including J. C. Penney, McCrory Corp., J. J. Newberry, McClelland Stores, and Ely-Walker Dry Goods Co., all of whom, when buying merchandise like exhibit 1, specified "runners" (R. 20). The witness further stated that it was the practice of his company to keep its records for 7 years only, and that records prior to 1930 were therefore not available, but that he could recall the character of the bills and circulars distributed to the trade prior to 1930, and that such merchandise as exhibit 1 was described therein and offered for sale as runners and never as rugs (R. 26, 27).

On recall the same witness testified further that "rugs" and "runners" are used in different ways, the runners in narrow passages and halls, also as a floor covering over a good rug or carpet to save it from wear, also for stair covering, while rugs are used to cover the floor space inside rooms (R. 46).

Plaintiff's second witness was Samuel Milgrim, vice president and secretary of the Providence Import Co., New York, from 1928 to date. He testified that they were importers of rugs and floor coverings, including "hit-and-miss" cotton rag floor coverings. He stated that his duties have been that of selling since 1926 (R. 30). His testimony may be said to be the same, and corroborative of that of the previous witness Davis; namely, that he has sold "hit-and-miss" cotton floor coverings at wholesale throughout the greater part of the United States, and that the term "rug" in such trade includes all floor coverings of different shape or form, finished on all sides, but does not include such floor coverings where the length is three or more times greater than the width, which are then called "runners," and that the term "rug" did not include merchandise of the size or shape of exhibit 1, which prior to June 17, 1930, was sold as runners (R. 33). The witness stated further that his company, the Providence Import Co., distributed circulars or advertising matter to the trade prior to 1930, and he introduced in evidence two circulars and a price list sent out to the trade, which were marked collective exhibits 2–A, 2–B, and 2–C (R. 37). While he was not able to give the dates of these circulars, he stated they were between 1926 and 1930, and that in such circulars merchandise like exhibit 1 is illustrated and described as "runners" (R. 38).

Roy Cleeland, president of Robert Cleeland & Co., Philadelphia, was called as a witness by the defendant. He testified that his firm are manufacturers of

all types of cotton rugs, including rag rugs, and that they have been in business since 1847; that he has charge of the operation of the plant and is directly in charge of the sales force; that he has sold rag rugs commonly known as "hit-and-miss" all over the United States, and prior to 1930, including merchandise similar to exhibit 1, in all widths and lengths, and where the length was three times or more the width, namely, of the dimensions 27 by 90 inches, 27 by 108 inches, and 36 by 144 inches, and that the sales were at wholesale (R. 51-53); that he has heard the term "runners," and that his firm have made runners; that some people call a runner a rug and some call a rug a runner; that he has not manufactured articles that he calls runners (R. 57); that he sold merchandise commonly known as "hit-and-miss" type, manufactured of cotton, to Sears, Roebuck & Co. prior to 1930, including such merchandise where the length was three or more times the width (R. 58, 59). The witness' attention was called to the dictionary definition of the term "rug" reading: "A heavy textile covering for a floor, differing from a carpet in that it is properly made in one piece, commonly with a shaggy pile, and of a size to cover only a portion of a floor," and he stated that the trade understanding of the term was the same on or about June 17, 1930, and that it was definite, uniform, and general (R. 60), and that it included merchandise like exhibit 1. The witness testified further that he personally has been selling rugs since 1921; that he directs the manufacture and sale of all rugs and carpets made at their plant; that he comes into contact with the purchasers that come into the office; that they have salesmen that go all over the country, and that he personally has contacted buyers from Sears, Roebuck & Co., Montgomery Ward & Co., and has called on J. C. Penney, W. T. Grant, and others (R. 61, 62).

Under cross-examination the witness stated that he had charge of the manufacturing plant in 1921, when he was 20 years old, and has been conducting the manufacturing end all the time; that in 1921 he "sat-in" on all matters of selling that came to the office and that he worked in the plant every summer from the time he was 16 years old (R. 66); that his firm issues invoices when they sell goods, but was unable to produce any prior to 1930, as their office records from 1921 to 1930 are no longer in existence (R. 67). He stated further that there is a class of "hit-and-miss" merchandise referred to in the trade as runners. His description of a runner is a long narrow rug, and that it could be a wide runner or a narrow runner (R. 68, 69).

This witness on the stand showed a very biased attitude. He was evasive, his evidence was contradictory, and in the main was an expression of his individual opinions instead of the trade's understanding of the terms "rugs" and "runners." For instance, on cross-examination he testified in part as follows:

X Q. You know a long rug as a runner?—A. A long rug, yes.
X Q. In other words, a long rug, say 40 x 40, would be a runner?—A. No.
X Q. Well, what do you mean?—A. A long, narrow rug.
X Q. So it is a question of dimensions, isn't it?—A. But they are all rugs.
Mr. RICHARDSON. I move to strike that out.
Judge KINCHELOE. Strike it out.
X Q. If you would just listen to my question and answer it and not try to prove a case, we would get along much better. A runner is a narrow floor covering; is that right?—A. Not necessarily, no. It could be a wide runner or a narrow runner.
X Q. What dimensions would you say were the outside limit in width of a runner?—A. I would not know.
X Q. Why not?—A. It is something to cover an amount of square feet of floor, according to the floor space.
X Q. It would be a runner?—A. Not necessarily.
X Q. I am asking you about a runner. You say there is a class of merchandise referred to in the trade as runners.—A. In my trade I refer to all things as rugs.
X Q. You say, other people refer to them as runners?—A. Some other types of business possibly may.

X. Q. Then they are talking about a long rug?—A. Then they are rugs.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Well, what are the physical dimensions of merchandise that was referred to as runners in regard to both length and width?—A. A long piece of carpeting.

X Q. Do you know what "dimensions" means?—A. There is no specific dimensions that anybody can state. I cannot state that to you.

X Q. It wouldn't make any difference whether it was 100 feet long and one inch wide, or ten feet long and a hundred wide; dimensions have nothing to do with it, in other words?—A. It is probable——

X Q. Will you answer my question. You have said there is a type of merchandise referred to in your trade.—A. By the trade. I don't say by my trade; by the trade.

X Q. That's right; I prefer that. Referred to in the trade as runners; that is what you said, isn't that right?—A. May I clarify that?

X Q. That is what you said, isn't it?—A. I presume so.

X Q. But you can't give the dimensions of those runners?—A. No, I can't give any dimensions.

X Q. You don't know whether that meaning for the word "runners" was universal in the trade or not, do you?—A. I presume they used that word.

X Q. Universally?—A. I presume so.

The witness was then again referred to the dictionary definition of "rugs' reading: "A heavy textile covering for a floor, differing from a carpet in that it is properly made in one piece, commonly with a shaggy pile," etc., and was questioned further as follows:

X Q. Well, now have "hit-and-miss" rugs a shaggy pile?—A. They are fuzzy.

X Q. Would you say that was a shaggy pile?—A. They are a fuzzy type; that is shaggy.

X Q. You say, showing you exhibit 1, that the pile of that rug is fuzzy or shaggy?—A. There is a fuzz; here is a fuzz.

X Q. You call that fuzz?—A. There is a difference between a "hit-and-miss" rug and a Wilton rug or some other type. There are different types of rugs. That dictionary definition spoke of a high pile floor covering, such as that covers the floor here, or in a Wilton or some other type of merchandise.

X Q. Do you deal in Wilton rugs?—A. I do not.

X Q. Stick to something you know something about. Has exhibit 1 either a shaggy or a woolly pile? Look at it.—A. No (R. 69–71).

Upon questioning by Judge Kincheloe the witness further stated that he would call merchandise identical in character with exhibit 1, that is as long as the courtroom and only 2 inches wide, a runner, but that they are all rugs in his estimation, although it might be termed in the trade as a runner (R. 72, 73).

The second witness for the Government was Samuel Allenson, manager of the New York office of the Topton Rug Manufacturing Co., for 10 years, and who prior thereto was in the floor covering business for 17 years (R. 73); he testified that from 1906 up to the present he has handled merchandise known as "hit-and-miss" floor coverings; that he handled such merchandise prior to 1930, where the length was three or more times its length [width] at wholesale all over the country; that he sold merchandise like exhibit 1 prior to 1930, and that in his opinion it is a "hit-and-miss" rug (R. 77); that he has heard the term "runner" used and referred to by purchasers, and has used the term himself; that a runner "is the shape of a rug"; that all rugs are not runners, and all runners are not rugs; that a strip of carpet that is not finished at the end is not a rug, but is called a runner, and that a finished article like exhibit 1 is also referred to as a runner in the trade at times (R. 78).

This witness' evidence was conflicting, and on cross-examination was largely corroborative of the testimony of the plaintiff's witnesses a part of which is as follows:

X Q. Give me the dimensions of a floor covering known as a runner.—A. There

are so many different sizes that it is pretty hard to name them; for instance, 24 inches by 9 feet; that would be 108 inches by 24 inches   (R. 83).

\*       \*       \*       \*       \*       \*       \*

X Q. Would you say a floor covering, "hit-and-miss" type, whose length was three times or more its width would come within your idea of what the trade knows as a runner, so far as yourself is concerned?—A. Yes   (R. 84).

\*       \*       \*       \*       \*       \*       \*

X Q.  The definition was read to you by Government counsel and you. were asked whether you agreed with that definition as to the common meaning of the word "rug."  That definition was as follows: "A textile covering for a floor, differing from a carpet in that it is properly made in one piece, commonly with a shaggy pile, and of a size to cover only a portion of a floor."  Now, will you look at exhibit 1?  Has that any pile?—A.  No; that has no pile.

\*       \*       \*       \*       \*       \*       \*

X Q.  Now, if you take a rug or a floor covering rather, which covers an entire room, would the trade consider as a rug, or floor covering, a "hit-and-miss" floor covering, which covers an entire room?—A. That question is rather vague.
   X Q.  What is vague about it?—A.  Because we can take a rug that is larger than a room and thoroughly cover the entire room.
   X Q.  But you wouldn't?—A.  I certainly would.  I would turn the ends under, and so it is a rug.
   X Q.  So a floor covering of the "hit-and-miss" character, which covers the entire surface of the floor of a room, you would call that a rug?—A.  Yes, I would call that a rug   (R. 85, 86).

On redirect examination the witness stated that he has never seen any cotton rag rug of the "hit-and-miss" type which has a pile (R. 86).

David J. Thompson was called as another witness by the Government, but was not permitted to testify, as he was shown to have had no personal experience in the purchase or sale of cotton rag "hit-and-miss" floor coverings.(R. 87).

A case that is very analogous to and in which the facts closely parallel the one under consideration is that of *United States* v. *Telfeyan & Co.*, 14 Ct. Cust. Appls. 128, T. D. 41648, involving the classification of so-called "Anatolian mats."  The merchandise was assessed for duty under paragraph 1116 of the Tariff Act of 1922, as oriental rugs.  The contention of the plaintiff was that commercially the articles were not known as rugs, but as mats, and that they were therefore dutiable under paragraph 1117 of said act, as wool mats.  The appellate court, in affirming the decision of this court holding the merchandise dutiable as claimed, quoted from said decision, with approval, as follows:

Two members of the importing firm, who have been in the business for upward of 20 years and who sell the merchandise in question throughout the country, testified.  Their evidence establishes, under all the rules of commercial definition or trade custom, that the merchandise in question is universally sold as "Anatolia mats" and never as rugs in the wholesale trade of the United States, and, further, that commercially anything less than 4½ feet by 2½ feet is a mat, irrespective of the material of which it is composed, and there is nothing in the record to contradict this testimony. .

The Government claims, on the other hand, that by all the definitions in the principal dictionaries "rug" is a generic term which includes a mat, the various qualities being graded under that term in paragraph 1116.

Giving this fact its full weight it only tends to establish that under the *common meaning* of the term a mat is included under the word "rug" and consequently if there was no proof of the commercial meaning these goods would be properly classified as mats, commonly known as a class of rugs under paragraph 1116 at the oriental rate.

But the difficulty is that, in establishing a commercial definition (as we hold it does) of the merchandise in question as mats less than 4½ feet by 2½ feet in size, irrespective of material and as distinguished from rugs which are larger, the importer's evidence limits the term rugs in paragraph 1116 as not *commercially* including these mats.

As the commercial meaning when different from the common meaning must

always govern in customs we are constrained to hold that the merchandise in question should be classified as mats at 30 per cent under the third clause of paragraph 1117. * * *.

So we are of the opinion, and so hold, that the testimony of plaintiff's witnesses herein clearly establishes that the term "rugs" as used in the cotton rag "hit-and-miss" floor covering trade at and prior to June 1930, had a commercial meaning different from its common meaning; that such commercial meaning was definite, uniform, and general throughout the trade and commerce of the United States; that such commercial meaning excluded cotton "hit-and-miss" floor coverings whose length exceeds the width by three times or more, and that the testimony of plaintiff's witnesses is largely corroborated by the testimony of both of defendant's witnesses on cross-examination.

 *  *  *  *  *  *  *

The foregoing case was appealed by the Government to our appellate court, which court, in affirming our decision and judgment, said in part as follows:

It is unnecessary for us to discuss the factual record which was clearly epitomized in the decision below. It suffices to state insofar as this record is concerned, that appellee proved by a clear preponderance of the evidence that the imported articles by reason of their relative dimensions (length more than three times width) and their use, are definitely, uniformly and generally known to the cotton rag hit-and-miss floor covering trade to be "runners" as distinguished from the common meaning of the term "rag rugs" as used in the involved paragraph.

 *  *  *  *  *  *  *

As far as this case is concerned, in our opinion the imported merchandise was properly held by the trial court to be included, under the doctrine of commercial designation, in the expression "all other floor coverings," * * *.

In the present case the Government has called four additional witnesses in an effort to overcome said finding of the court in the incorporated case. The first was Elliott Fulton, connected with the Callaway Mills, of Lagrange, Ga., as divisional sales manager of cotton rugs for 3½ years, and who prior thereto was in the employ of Marshall Field Co., Chicago, as assistant sales manager in the Karastan rug division for 3 years, and before then and also prior to 1930 was assistant department head and buyer for floor coverings with the same company. He stated that he purchased merchandise like exhibit 1 in suit 4383 (the incorporated case), which included hit-and-miss rag floor coverings of all sizes, at wholesale, and also included sizes and shapes which were three times or more longer than the width, such as 2' 2'' by 9', 2' 3'' by 12', 3' by 9', and 3' by 12', for many years; that he bought merchandise similar to said exhibit 1 from the Akawo Co., Geo. E. Mallinson Importing Co., Nippon Dry Goods Co. of California, prior to 1930, and that he bought them as hit-and-miss rugs. He stated further that prior to 1930 he had supervision over other traveling salesmen covering the entire United States; that he himself sold to buyers who visited their salesrooms, and previ-

ous to that was a traveling salesman covering a group of the Southern States.

Counsel for the Government then read to the witness the definition of the term "rug" from Funk & Wagnalls New Standard Dictionary as quoted hereinbefore, and asked the witness whether or not in the wholesale trade of the United States at and prior to 1930 that definition or understanding of the term rug was the same or different in the hit-and-miss floor coverings trade, to which the witness answered "I believe not, no, sir" (R. 14).

His only personal experience in buying and selling floor coverings prior to June 17, 1930, was as assistant department head and buyer for Marshall Field & Co., and was limited to selling to such buyers as visited his company's salesroom and selling to some customers in a group of Southern States.

The next witness was Hugh L. McElroy, who is in business for himself under the name of McElroy-Sheenan, Inc., at Great Neck, N. Y., in the buying and selling of floor coverings. He testified that he has been in that business about 53 years, during which time he purchased all types of floor coverings, meaning wool floor coverings and cotton floor coverings; that he bought floor coverings for approximately 100 leading department stores in territory from Maine to California, and from Canada to the Gulf of Mexico; that he bought as their agent, and charged them a service charge. He stated, however, that he did not sell them; that he bought hit-and-miss floor coverings for those 100 stores at wholesale prior to 1930; that they were composed of cotton, wool—anything; that he purchased hit-and-miss floor coverings of cotton prior to 1930 where the length was three or more times the width from Akawo, Mallinson, Nippon Import and Trading Co., Horokoshi—mostly Japanese houses; that he dealt in thousands of these rugs or floor coverings. When asked if there was any designation or name for them in the trade, he answered—"We call them rugs. We bought them by the square foot." The witness stated further that in his conversations with the sellers of the merchandise they referred to them as hit-and-miss rugs, irrespective of the size (R. 18–21), and that the same thing applied to hit-and-miss floor coverings of the sizes 3 by 9 feet, 2 by 12 feet, and 3 by 12 feet.

So prior to June 17, 1930, his personal experience in the floor-covering business was confined to buying for leading department stores, including the plaintiffs, throughout the United States as their agent, charging them a service charge for so doing. Rugs like exhibit 1 he called rugs, and those from whom he purchased also called them hit-and-miss rugs; but he bought *on orders* made out by the stores, and simply O. K.'d the bills. He did not know whether he bought at wholesale or retail, and he never sold a rug.

The third witness was Samuel Kosby, also a wholesale buyer of floor coverings for various department stores, such as Gimbel Brothers, the Hearn Department Store, and the Namm Store in Brooklyn, from 1922 to the present time, who testified that the floor coverings included cotton hit-and-miss rugs of different sizes, including those where the length was three or more times the width, about such as exhibit 1 in suit 4383, and that he purchased them as rag rugs (R. 29). He admitted, however, that there was a type of floor covering known in the trade as runners, which would be a long narrow floor covering such as *exhibit 1 in the incorporated case*. When asked how extensively he sold rugs like said exhibit 1 prior to 1930, he answered that he sold them since 1910, but only in New York and Brooklyn, and then only at retail (R. 30/31). Also, while the witness stated that the same terminology was used in placing orders for the hit-and-miss floor coverings in question by Gimbel Brothers as when he was with Hearn's and Namm's stores, plaintiffs produced what purports to be a purchase order placed by Gimbel Brothers, of New York, to the Providence Import Co. (exhibit 1 in the present case), apparently of date September 26, 1942, ordering 12 each of 2' by 7', 2' by 8', and 27'' by 9' "Runners, rag."

This witness' only personal experience prior to June 17, 1930, was buying floor coverings in New York City and for the Namm Store in Brooklyn, and selling for said store at retail only in Brooklyn. This experience certainly does not qualify him as a commercial witness.

The fourth witness called by the Government was George C. Ruston. He testified that he has been employed by the I. Namm Store, in Brooklyn, N. Y., since 1935, and that prior thereto he was employed by Gimbel's Department Store, New York, from 1925 to 1935, as a salesman and buyer of the downstairs basement floor coverings; that he purchased all types of floor coverings at wholesale, including hit-and-miss of the kind and size here in question, most of which, however, were imported on his own order. He stated that he also bought some floor coverings from jobbers in the United States. Inasmuch, however, as the witness was shown to have purchased only in New York, and the sales made by him were mostly at retail, objection of counsel for the plaintiff was sustained to the question asked of this witness whether the trade understanding of the term "rug" was the same or different from the dictionary definition, quoted, *supra* (R. 49, 50).

So prior to June 17, 1930, all the hit-and-miss rugs he bought was in New York City, and all the hit-and-miss rugs he sold was within the radius of New York City only, and most of these sales were retail. Also, the only merchandise like exhibit 1 that he bought or sold prior to June 17, 1930, was in Greater New York.

None of these witnesses, in our judgment, had enough experience in the buying and selling of floor coverings like exhibit 1 to know how

said article was bought and sold at wholesale in the usual course of trade throughout the trade and commerce of the United States prior to June 17, 1930. A mere selling to some customers in a group of Southern States, or a few purchases *on orders* of stores, or a few purchases in New York or Brooklyn, or a few sales at retail in Brooklyn or New York, certainly does not refute in the least the practically uncontradicted testimony of plaintiffs' witnesses in the incorporated case as to how the merchandise represented by exhibit 1 was sold in the trade and commerce of the United States prior to June 17, 1930.

So, after carefully considering the testimony of all the witnesses in both the incorporated and the present case, we are of the opinion, and so hold, that the testimony of plaintiffs' witnesses in the incorporated case clearly establishes that the term "rugs" as used in the cotton rag hit-and-miss floor covering trade at and prior to June 17, 1930, had a commercial meaning different from its common meaning; that such commercial meaning was definite, uniform, and general throughout the trade and commerce of the United States; that such commercial meaning excluded cotton "hit-and-miss" floor coverings whose length exceeds the width by three times or more. The protests are therefore hereby sustained, and all the merchandise covered thereby, whose length exceeds the width by three times or more, are held properly dutiable at 35 per centum ad valorem under paragraph 921 of said act of 1930, as "all other floor coverings" of cotton.

Judgment will be rendered accordingly.