**OAK LAMINATES DIVISION of OAK MATERIALS GROUP, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 81–8–01084.**

United States Court of International Trade.

Sept. 25, 1984.

Barnes, Richardson & Colburn (David O. Elliott and Richard Haroian, New York City, at the trial and on brief), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, New York City (Deborah E. Rand, Washington, D.C., at the trial and on brief), for defendant.

RE, Chief Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from Taiwan, and described on the customs invoice as "copper clad laminates."

The imported copper clad laminates are used to manufacture printed circuit boards, and consist of two types: (1) *FR 4*, comprised of eight plies of woven fiberglass fabric impregnated by epoxy resin, and (2) *Oak 910*, comprised of three plies of non-woven fiberglass fabric placed between two plies of woven fiberglass fabric, and impregnated by epoxy resin. In addition, copper foil is added on both sides of the FR 4 and Oak 910 laminate sheets.

The merchandise was classified by the Customs Service as "articles not specially provided for, of rubber or plastics ... other," under item 774.55 of the Tariff Schedules of the United States (TSUS). Therefore, it was assessed with duty at the rate of 8.5% ad valorem.

Plaintiff protests this classification and contends that the merchandise is properly classifiable under item 770.05, TSUS, as "articles not specially provided for wholly or almost wholly of reinforced or laminated plastics," duty-free under the Generalized System of Preferences.

The pertinent statutory provisions of the tariff schedules are as follows:

Classified Under:

    Schedule 7, Part 12, Subpart D

Articles not specially provided for, of rubber or plastics:

       .   .   .

774.55             other  .............................. 8.5% ad valorem

Claimed Under:

    Schedule 7, Part 12, Subpart A

Articles not specially provided for wholly or almost wholly of reinforced or laminated plastics:

    Laminated:

770.05        Plates or Sheets ..................................... Free
           (under the Generalized System of Preferences)

---

Specifically, therefore, the question presented is whether the imported merchandise consists of "articles not specially provided for, of rubber or plastics ... other," as classified by Customs, with a duty rate of 8.5% ad valorem, or plates or sheets "almost wholly of reinforced or laminated plastics," duty-free under the Generalized System of Preferences.

After careful examination of the imported merchandise, the testimony of the witnesses, and the entire record, it is the determination of the court that the plaintiff has not overcome the presumption of correctness which attaches to the Customs Service's classification of the imported merchandise. *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878, *reh'g denied*, 739 F.2d 628 (Fed.Cir.1984); *E.R. Hawthorne & Co. v. United States*, 730 F.2d 1490 (Fed.Cir.1984).

At trial, plaintiff called two witnesses familiar with the manufacture of laminates for the printed circuit board industry. Plaintiff's first witness, Dr. Jiri Konicek, holds a Ph.D. in Thermal Chemistry and a M.S. in Physical Chemistry. He has substantial experience in the printed circuit board industry, holds several patents that relate to printed circuit board technology, and is currently Vice President of Research and Product Engineering at plaintiff's company, Oak Materials Group.

In his testimony, Dr. Konicek traced the evolution of electric circuit technology, and highlighted the role copper has played in that evolution. In earlier times, according to Dr. Konicek, copper served two purposes: (1) to provide the transfer of current from component to component, and (2) to provide a strong bond or good adhesion between the conductive lines and the laminate core. As electric circuit technology developed, a process was created to produce conductive patterns on both sides of a laminate core, and to connect them by plating. This process, as stated by Dr. Konicek, entailed placing copper foil on both sides of a plastic laminate sheet. In addition, in order to connect the circuit patterns on either side of the sheet, it was necessary to drill holes through the board, and deposit an electrical conductor in those holes where no copper was present. The depositing of copper in the holes necessarily involved adding copper to the surface of the copper foil already present. Dr. Konicek stated that, since the total current transfer can be accomplished by the plated-on copper, it is his belief that the conductive property of the original copper foil is no longer necessary. Therefore, he stated that since it is no longer necessary to have the copper foil provide a current transfer function, it is the laminate core that is indispensable in the manufacture of printed circuit boards.

Dr. Konicek also explained how circuit boards can be manufactured from unclad laminates, *i.e.,* laminates which do not contain copper foil. He stated that the unclad laminates must go through a process, either semi-additive or fully additive, which requires the purchasers of unclad laminates to apply the copper. Dr. Konicek concluded his testimony by stating that, since the laminate core contains all the components, and provides all the insulating properties of circuit boards, the laminate core is the essential element of the article.

Plaintiff's second witness was Mr. Herbert Allen, Manager of Research and Development for the Advanced Circuitry Division of Litton Industries in Springfield, Missouri, a company engaged in the manu-

facture of printed circuit boards for the retail market.

Mr. Allen testified that his company purchases both clad and unclad laminates from the plaintiff. He stated that printed circuit boards manufactured from clad and unclad laminates are commercially interchangeable, and indicated that his company had sold printed circuit boards made from both types of laminates to several customers. Mr. Allen also testified that the purpose of the copper foil is to obtain good adhesion between the plated-on copper and the surface of the laminate core. He stated that this function could be performed by some other materials such as phenolic resin, nickel, aluminum, or silver. In Mr. Allen's opinion, it is the plastic core, not the copper foil, that is indispensable in the manufacture of a printed circuit board.

In this case, the defendant did not merely rely on the statutory presumption of correctness that prevails in customs classification cases. It introduced persuasive expert testimony to refute the testimony of plaintiff's witnesses, and to prove that the merchandise was properly classified by Customs. *See Schott Optical Glass, Inc. v. United States*, 82 Cust.Ct. 11, 24, 468 F.Supp. 1318, 1326, *aff'd* 67 CCPA 32, C.A.D. 1239, 612 F.2d 1238 (1979); *Ameliotex, Inc. v. United States*, 77 Cust.Ct. 72, 84, C.D. 4673, 426 F.Supp. 556, 564 (1976), *aff'd*, 65 CCPA 22, 565 F.2d 674 (1977).

The defendant called two witnesses familiar with the printed circuit board industry, Dr. Richard J. Jablonski and Dr. Joseph Bucci. Dr. Richard J. Jablonski holds a B.S. in Chemistry and a Ph.D. in Organic Chemistry, and is Manager of Technology Development for the Laminates Division of the General Electric Company. His duties include the development of copper clad laminates, the maintenance of the specifications for raw materials used in the production of laminates, and the resolution of customer problems relating to purchased laminates.

Dr. Jablonski rejected the proposition, offered by plaintiff's witness, that the copper foil is merely an adhesive. He stated that no one in the industry considers this to be the function of the copper. He also stated that the purpose of a printed circuit board is to conduct electricity, and that, of all the raw materials or components present in the laminate, only copper has the ability to conduct electricity. Dr. Jablonski also offered extensive testimony on the importance of copper in the manufacture of the laminates. He stated that, while plaintiff's witness testified that it is theoretically possible to use metals other than copper in electric circuitry, the only other metal used, nickel, is used in negligible amounts. Thus, Dr. Jablonski concluded that copper is the predominant metal used in manufacturing printed circuit boards.

Dr. Jablonski also discussed the other types of boards available, *i.e.*, unclad laminates put through a fully or semi-additive process, but noted that these processes are not uniformly available, since they require the printed circuit board manufacturer to be a licensee of either the Photocircuit or Litton companies. He added that General Electric, which holds a prominent place in the laminates business, terminated its manufacture of other types of circuit boards because they were not profitable, and did not produce circuitry with the same performance level as copper clad laminates.

The defendant's second witness, Dr. Joseph Bucci, holds a Ph.D. in Solid State Physical Chemistry, has extensive experience in the electronics field, and is Manager of Market Development for the Foil Division of Gould, Incorporated. Gould manufactures the copper foil used on copper clad laminates. Dr. Bucci's testimony pertained to the production of copper foil. He stated that numerous precautions are taken to ensure the purity of the copper used to make the foil. For example, foil consistency, strength, and surface smoothness are determined when the copper is in the liquid phase. In addition, different chemical additives are used at a latter stage to achieve the various physical properties of the copper foil. Finally, Gould applies a brass treatment or "thermal barrier" to the copper to prevent it from breaking down, and

from making contact with the epoxy resin. Dr. Bucci concluded, therefore, that since the copper applied through the semi-additive or fully additive process does not possess the same properties as the copper foil, the copper foil serves a special function and is not merely an adhesive.

■ As in all customs classification cases, plaintiff has the burden of overcoming the statutory presumption of correctness which attaches to the government's classification. 28 U.S.C. § 2639(a)(1) (1982). In determining whether the presumption has been rebutted, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878, *reh'g denied*, 739 F.2d 628 (Fed.Cir. July 17, 1984).

In this case, plaintiff contends that the merchandise was incorrectly classified by customs, and is properly classifiable under item 770.05, TSUS, as "articles not specially provided for wholly or almost wholly of reinforced or laminated plastics." It is plaintiff's contention that the testimony offered establishes that it is the plastic laminate core which imparts the "essential character" to the imported articles, and, therefore, the imported articles are "almost wholly of" plastic.

To determine whether plaintiff's merchandise is "almost wholly of" laminated plastics, the court must examine General Headnote 9(f)(iii) which defines the phrase "almost wholly of" as follows:

> (iii) "Almost wholly of" means that the essential character of the article is imparted by the named material, notwithstanding the fact that qualities of some other material or materials may be present; ...

*Id.*

The meaning of the phrase "almost wholly of" was first judicially construed in *United China & Glass Co. v. United States*, 61 Cust.Ct. 386, C.D. 3637, 293 F.Supp. 734 (1968). The merchandise in *United China* consisted of a glass water ball mounted on a plastic base with an insert made of artificial flowers. Plaintiff claimed that the articles were "almost wholly of" plastic, and therefore, were dutiable under item 748.20 of the tariff schedules. In holding that the "glass water balls" were not "almost wholly of" plastic, the court noted that, in order for the articles to be "almost wholly of" plastic within General Headnote 9(f)(iii), the plastic must be the material which imparts the "essential character" to the article. The court found that the essential character of the article was imparted by the glass ball, and made the following pertinent observations:

> The character of an article is that attribute which strongly marks or serves to distinguish what it is. Its essential character is that which is indispensable to the structure, core or condition of the article, *i.e.*, what it is. Webster's Third New International Dictionary, 1966 edition. The article, exhibit 1, has several distinguishing characteristics, namely, the glass ball and decorative insert of plastic flowers....
>
> The indispensable and distinguishing part, that which imparts the essential character of the structured article in this litigation is, in our opinion, the glass ball. We say this because, if we take the glass ball away, we are left with (1) some plastic flowers set in a rubber cap and (2) a plastic base, neither of which has any utility, so far as the record shows, without the glass ball. Indeed, any decorative insert could quite easily be substituted in place of the plastic flowers without destroying the essential character of the article as manifest in the glass ball.

293 F.Supp. at 737.

In *Larry B. Watson Co. a/c Decoration Products Co. v. United States*, 64 Cust.Ct. 343, C.D. 4001 (1970), the merchandise consisted of polyvinyl chloride film, colored or "metallized" on one or both sides. The court held that, since the essential character of the merchandise was imparted by plastic, it was "almost wholly of" plastic. In declining to adopt the defendant's position, that the essential character was im-

parted by the article's shiny finish, the *Watson* court stated that:

The uncontradicted testimony reveals clearly that the characteristics of the imported film which make it desirable for the manufacture of decorations are its flexibility, its ease of die cutting and the fact that it is flameproof. These are the features or characteristics which distinguish it from other merchandise used for the same purpose, and these qualities are imparted by the polyvinyl chloride. If the color lacquer of metallic deposit were removed, or not added to the finished product, one would still have a basic raw material that could be fully utilized for the manufacture of decorations. Without minimizing the importance of the lacquer, it may be pointed out that the coloring could be added after the importation, and that the reason it is imported colored "is a matter of economics", *i.e.,* "it is cheaper."

64 Cust.Ct. at 350.

In the case at bar, plaintiff contends that, since the color lacquer used in *Watson* is analogous to the copper foil, *Watson* is controlling here. The court does not agree. It is apparent from the facts of *Watson* that the polyvinyl chloride was usable with or without coloring, and that the coloring could have been added after importation. In this case, however, because of the composition of the laminate core, it is virtually impossible to add the copper after importation. This is due to the fact that the core's capability to receive copper results from the addition of ingredients or components not present in the imported merchandise. In other words, in order for an unclad core to have copper added after importation, it must have a different composition than the core of the imported merchandise. Thus, the *Watson* case is clearly distinguishable, and does not support plaintiff's contention.

The court has also reviewed *A.N. Deringer, Inc. v. United States,* 66 Cust.Ct. 378, C.D. 4218 (1971) and *Canadian Vinyl Industries, Inc. v. United States,* 76 Cust.Ct. 1, C.D. 4626 (1976), *aff'd,* 64 CCPA 97, C.A.D. 1189, 555 F.2d 806 (1977) cited by the plaintiff. A close study of those cases, however, will reveal that they are of little assistance, since they were decided on the particular facts of each case.

A more pertinent and helpful case is *Marshall Co. v. United States,* 67 Cust.Ct. 316, C.D. 4291, 334 F.Supp. 643 (1971). In *Marshall,* the question presented was whether a rayon fabric with rubber coating was properly classifiable as "flexible strips, almost wholly of rubber." The merchandise in *Marshall* was used in the manufacture of gaskets, washers, packing heads and diaphragm material. The court observed that the fabric portion gave strength and stability to the merchandise, and found that these qualities were *"equally essential"* to those imparted by the rubber. Thus, the court held that, since the rubber did not impart the essential character to the imported merchandise, the rayon fabric was not "almost wholly of rubber."

In determining whether an article is "almost wholly of" a particular substance, the court "may rely upon and accord great weight to expert testimony." *Kimball Systems, Inc. v. United States,* 80 Cust.Ct. 54, 60, C.D. 4738 (1978). In the present case, the four witnesses were clearly qualified to discuss the nature and properties of the imported merchandise. The court, however, places greater reliance upon the testimony of the defendant's experts. Dr. Jablonski and Dr. Bucci exhibited full mastery of the subject, and presented clear and convincing testimony as to the importance of the copper foil in the imported merchandise.

When dealing with highly technical processes, it may be useful to refer to other related items which serve to highlight the relevant aspects of the article in question. Nevertheless, the plaintiff relied too heavily upon merchandise not in question. Specifically, plaintiff employed the use of unclad laminates in an attempt to prove the essential nature of the plastic core, yet the testimony clearly showed that unclad laminates have a different core than copper

clad laminates. Similarly, laminates which use a semi-additive or fully additive process also played a prominent role in plaintiff's argument. Once again, however, the testimony clearly illustrated that these technologies are not utilized in the imported merchandise. Hence, the testimony of Dr. Jablonski and Dr. Bucci clearly refuted plaintiff's contention that it is the plastic laminate core which is the indispensable or essential element of the imported merchandise.

The court has meticulously searched the record for proof that one element, more than any other, may be said to be essential. Such a finding could not be made. It is clear from the testimony, and the merchandise itself, that the plastic laminate core and the copper foil, like the fabric and rubber of the *Marshall* case, are of equal importance or "equally essential." As Dr. Jablonski testified:

> [A] better word for a laminate might be composite.... In a laminate, we are making a composite of raw materials. We are putting them together someway and we are going to manufacture a product which we call a laminate, and the reason we do that is that we want to make a new composite structure that has properties that are not available from either of the raw materials or the individual components themselves.

A composite, from the latin *componere*, "to put together," clearly refers to anything made up of separate parts. The meaning of this definition is reflected in *Eutectic Corp. v. Metco Inc.*, 418 F.Supp. 1186 (E.D.N.Y.1976), a patent case, in which the court stated that:

> The term "composite" as used herein is intended to designate a structurally integral unit and does not include a mere mixture of components which may be physically separated without any destruction of the structure. Thus, in the case of powder, the term "composite" does not include a simple mixture of individual granules of the separate components, but requires that each of the individual granules contain the separate

components which will exothermically react, forming intermetallic compounds. 418 F.Supp. at 1208.

That a composite article can be considered one "essential element" is not novel. Indeed, it was stated long ago that:

> [E]verything existing is either simple or composite. Now simple things are neither actually nor potentially divided, whilst composite things do not exist as long as their constituent parts are divided but only after these parts have come together to compose the thing. Clearly then everything's existence is grounded in indivision.

Thomas Aquinas, *Summa Theologiae*, q. XI, art. I (T. McDermott trans. 1969).

■ The record leaves no doubt that "copper clad laminate" is a composite article, properly described as composed of a plastic laminate core and copper foil. Without the plastic core there is no product known as a "copper clad laminate." Without the copper foil, for all intents and purposes, there is no product that is a copper clad laminate. The essence or being of a copper clad laminate consists of the indivision of these two elements. The evidence presented establishes clearly that, even though the plastic core is an essential component of the imported article, the copper foil is also *"equally essential."* The court finds no merit in plaintiff's argument that the plastic core is the essential element of the article. The imported merchandise, therefore, is not classifiable as plates or sheets "almost wholly of reinforced or laminated plastics," admissible duty-free under the Generalized System of Preferences.

For the foregoing reasons, it is the determination of the court that the presumption of correctness which attaches to the government's classification has not been overcome. Since the court holds that the imported merchandise is properly classified as "articles not specially provided for, of rubber or plastics ... other," under item 770.05 of the tariff schedules, plaintiff's claim is denied and the action is dismissed.

Judgment will enter accordingly.