**SCHOTT OPTICAL GLASS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 81–01–00030.**

United States Court of International Trade.

Dec. 7, 1987.

Fitch, King & Caffentzis (Richard C. King and Peter Fitch, New York City, at trial, and on the briefs), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., Dept. of Justice, Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office (John J. Mahon, New York City, at trial, and on the brief), for defendant.

**MEMORANDUM OPINION**

CARMAN, Judge:

This case is before the Court pursuant to a remand ordered by the United States Court of Appeals for the Federal Circuit. *See Schott Optical Glass, Inc. v. United States*, 7 CIT 36, 587 F.Supp. 69 (1984), *rev'd and remanded*, 750 F.2d 62 (Fed.Cir. 1984). (*Schott II*). At issue is the proper tariff classification of seven types of glass which were described in invoices of entry papers for the merchandise as follows: KG 4, WG 345, UG 1, UG 5, UG 11, RG 9, and RG 830. All of the entered goods were

classified, by the United States Customs Service (Customs), as "other optical glass" under item 540.67 of the 1980 Tariff Schedules of the United States (TSUS). Customs assessed the duty at the rate of 23.1% *ad valorem.*

Plaintiff, Schott Optical Glass, Inc., (Schott) contends the glass type WG 345 should have been classified under item 542.42 as ordinary glass and assessed a duty rate of 0.5 cents per pound. Schott also urges glass types UG 1, UG 5, UG 11, RG 9, RG 830, and KG 4 should have been classified under item 542.92 as "colored or special glass" and assessed a duty rate of 0.6 cents per pound plus 2.4% *ad valorem.*

Defendant United States (Government) argues if the merchandise is not classified as "other optical glass" under item 540.67 TSUS, it should be classified as claimed by Schott. As an affirmative defense, however, the Government contends that the merchandise did not meet the packing requirements of headnote 4 [1] and therefore should have been denied entry and returned to Custom's custody pursuant to 19 C.F.R. § 141.113(b) (1980). [2]

The Government also asserts a counterclaim the applicability of which would arise in the event the merchandise is found to be properly classified under either of the claimed provisions of plaintiff. The Government essentially argues that since the entries occurred several years ago, Schott might be unable to return the merchandise to the custody of Customs as required by the regulations. The Government therefore requests liquidated damages in the sum of $23,117.25, the value of the merchandise. The Government asserts it is also entitled to liquidated damages in the amount of the estimated duties under the claimed provisions.

On May 10, 1982, the trial court in *Schott II* issued an order denying, without prejudice, Schott's motion to dismiss the Government's counterclaim as premature. The trial court ruled the issue would be moot if the court sustained the Government's classification. In *Schott II,* the trial court indeed dismissed the counterclaim as moot. *See* 7 CIT at 42, 587 F.Supp. at 73. In light of the Court's holding to follow, the Court does not reach these issues.

The Court now turns its attention to the relevant tariff provisions contained in Schedule 5, Part 3, TSUS (1980). These provisions are set forth as follows:

[Classified under:] Subpart A:

\* \* \* \*

Optical glass in any form, including blanks for spectacle lenses and for other optical elements; non-optical-glass blanks for corrective spectacle lenses; synthetic optical crystals in the form of ingots, segments of ingots, sheets, or blanks for optical elements; all the foregoing not optically worked; polarizing material, in plates or sheets, not cut to shape or mounted for use as polarizing optical elements:

\* \* \* \*

540.67 Other optical glass and synthetic optical crystals; polarizing material ...................23.1% *ad val.*

1. Schedule 5, Part 3, Subpart B, Headnote 4, TSUS (1980) is set forth as follows:
   4. Glass provided for in items 542.11 through 542.98, imported in any shipment in quantities over 50 square feet of the same size and thickness, shall be denied entry unless—
   (I) packed in units containing, as nearly as the particular size permits, 50 square feet, or multiples thereof, or
   (II) packed in units containing multiples of the number of sheets of the same size and thickness which would be contained in a unit if packed to contain, as nearly as such size permits, 50 or 100 square feet, or

   (III) otherwise packed in a manner which conforms to the packing practices of the domestic glass industry as determined and published from time to time by the Secretary of the Treasury

2. The Government argues that in the event this Court should agree with plaintiff the merchandise was properly classified under the alternative provisions claimed, the provisions of headnote 4 would be applicable since they cover all glass provided for in items 542.11 through 542.98.

| [Claimed under:] | Subpart B: |
| | **** |

Glass (whether or not containing wire netting), in rectangles, not ground, not polished and not otherwise processed, weighing over 4 oz. per sq. ft.:

****

Other, including blown or drawn glass, but excluding pressed or molded glass:

Ordinary glass:

Weighing over 28 oz. per sq. ft.:

542.42      Not over 2–2/3 sq. ft. in area ............... 0.5¢ per lb.

[And Claimed under:]      Colored or special glass:

****

Weighing over 28 oz. per sq. ft.:

542.92      Not over 2–2/3 sq. ft. in area ............... 0.6¢ per lb.

           2.4% ad val.

---

The trial court, in *Schott II*, ruled the common meaning of the term "optical glass" had already been ascertained in *Schott Optical Glass, Inc. v. United States*, 82 Cust.Ct. 11, C.D. 4783, 468 F.Supp. 1318 (1979), *aff'd and reh'g denied*, 67 CCPA 32, C.A.D. 1239, 612 F.2d 1283 (1979) (*Schott I*). In *Schott I*, the court of appeals held the term "optical glass," as used in item 540.67, encompassed glass which was: "(a) Very high quality, (b) used for optical instruments, and (c) capable of performing an optical function...." 67 CCPA at 33, 612 F.2d at 1285. Thus, since *Schott I* had ascertained the common meaning of "optical glass" as used in the statute, the trial court in *Schott II* ruled the definition of "optical glass" in *Schott I* was *stare decisis*. The trial court in *Schott II* also concluded this definition was controlling until a change in the statute necessitated a change in meaning or until it was shown the prior decision was clearly erroneous. *Schott II*, 7 CIT at 38–39, 587 F.Supp. at 71. Accordingly, the plaintiff in *Schott II* was precluded from relitigating or offering any evidence as to that issue. The classification of the merchandise under item 540.67 TSUS was sustained, and the action was dismissed.

Plaintiff Schott then appealed from the trial court's judgment in *Schott II* which sustained the Government's classification. In remanding, the Court of Appeals for the Federal Circuit held Schott should have been permitted to introduce evidence showing the prior decision of the Court of International Trade in *Schott I*, which upheld the classification of similar glass, was clearly erroneous. *Schott II*, 750 F.2d at 65.

The court of appeals in *Schott II*, citing *United States v. Stone & Downer Co.*, 274 U.S. 225, 47 S.Ct. 616, 71 L.Ed. 1013 (1927), pointed out in a Customs classification case that a determination of fact or law, with respect to one importation, is not *res judicata* as to another importation of the same merchandise by the same party. The court indicated the opportunity to relitigate applies to both questions of construction of the classification statute as well as to questions of fact regarding the merchandise. The court stated that "[u]nder *Stone & Downer* the doctrine of *res judicata*— which bars litigation by the same parties of the same issue previously adjudicated ... would not bar Schott from relitigating the meaning of 'optical glass' or the classification of its filters in this case within that

category." [3] *Schott II,* 750 F.2d at 64 (citation omitted).

■ While the court of appeals in *Schott II* rejected the trial court's conclusion that *stare decisis* precluded Schott from offering further evidence, the court alluded to the well-recognized exception to *stare decisis* which permits a court to reexamine and overrule a prior decision that is clearly erroneous. The court asserted the issue was "not whether the arguments are the same but whether the new evidence would show that the rejection of those arguments in the prior case was clearly erroneous." *Schott II,* 750 F.2d at 64. Thus, while concluding Schott should have been allowed to offer additional evidence to undermine the prior decision in *Schott I,* the court of appeals in *Schott II* indicated the Court of International Trade should determine what evidence should be admitted, in the instant case, based upon the usual criteria of relevance, probative force, authenticity, accuracy, etc.

In the spirit of affording Schott a full opportunity to be heard and present its evidence, the Court presided over a lengthy trial which lasted eleven days. The parties have also presented extensive pretrial and post-trial briefs as well as a statement of supplemental authorities to support their respective positions.

In *Schott I,* Chief Judge Re, after an examination of the legislative history of TSUS 540.67 and the applicable case law, determined color filtered glass which was (a) very high quality; (b) used for optical instruments; and (c) capable of performing an optical function, met the definition of optical glass for tariff purposes. *See* 82 Cust.Ct. at 16, 468 F.Supp. at 1321 (citing *Semon Bache & Co. v. United States,* 25 CCPA 239, T.D. 49339 (1937); *G.A.F. Corp. v. United States,* 67 Cust.Ct. 167, C.D. 4269 (1971); and *Ednal Co., Inc. v. United States,* 6 Cust.Ct. 552, Abs. 45423 (1941)). The court determined, on the basis of the presumption of correctness which attaches to a classification by Customs, the foregoing indicia were presumed to have been met with regard to the entries involved. Chief Judge Re noted that while Schott did not disagree with these indicia, Schott urged an additional factor must be present, *i.e.,* the glass must have a refractive index and dispersion with a known and controlled close tolerance (four to six decimal places for refractive index). The court held Schott failed to sustain its burden of proof with regard to this additional factor and overruled the protest.

**3.** The United States Supreme Court has explained the rationale of the exception to the doctrine of *res judicata* as follows:

There ... should be an end of litigation ... but circumstances justify limiting the finality of the conclusion in customs controversies to the identical importation. The business of importing is carried on by large houses between whom and the Government there are innumerable transactions, as here for instance in the enormous importations of wool, and there are constant differences as to proper classifications of similar importations. The evidence which may be presented in one case may be much varied in the next. The importance of a classification and its far-reaching effect may not have been fully understood or clearly known when the first litigation was carried through. One large importing house may secure a judgment in its favor from the Customs Court on a question of fact as to the merchandise of a particular importation, or a question of construction in the classifying statute. If that house can rely upon a conclusion in early litigation as one which is to remain final as to it, and not be reheard in any way, while a similar importation made by another importing house may be tried and heard and a different conclusion reached, a most embarrassing situation is presented. The importing house which has, by the principle of the thing adjudged, obtained a favorable decision permanently binding on the Government will be able to import the goods at a much better rate than that enjoyed by other importing houses, its competitors. Such a result would lead to inequality in the administration of the customs law, to discrimination and to great injustice and confusion. In the same way, if the first decision were against a large importing house, and its competitors instituted subsequent litigation on the same issues, with new evidence or without it, and succeeded in securing a different conclusion, the first litigant, bound by the judgment against it in favor of the Government, must permanently do business in importations of the same merchandise at great and inequitable disadvantage with its competitors.
*United States v. Stone & Downer Co.,* 274 U.S. at 235–36, 47 S.Ct. at 618–19 (footnote omitted).

In affirming the decision of the trial court, the court of appeals in *Schott I* adopted the indicia of optical glass as determined by the trial court. The court held the colored glass entries, which were of very high or the highest available quality in glass chosen for its absorption properties, were properly classified as optical glass for tariff purposes.

The question presented in the instant case, which is similar to that which was presented in *Schott I*, pertains to the proper classification of certain filter glass.

In *Schott II*, Judge Maletz described the subject merchandise, which description this Court adopts, as follows:

> Each of the seven types of filter glass is separately identified by invoice number, i.e., KG 4, WG 345, UG 1, UG 5, UG 11, RG 9, and RG 830. The KG 4 (slightly greenish in color) functions to absorb the near infrared light while allowing transmittance of visible light. It is used in cold light sources and in film projectors where it protects the transparency from being destroyed by heat. It is also used in sighting and aiming devices where it filters out infrared energy to maintain constant visibility of the ranges. All of these uses are in optical instruments.
>
> The WG 345 (colorless) functions to absorb specific wavelengths in the ultraviolet and to transmit visible light. It is used in solar filter simulators which are optical instruments.
>
> The UG 1, UG 5, and UG 11 all absorb visible light and part of the near infrared light and are distinguished only by darkness and lightness of color. They are used as substrates on interference filters and in spectrophotometers both of which are optical instruments.
>
> The RG 9 absorbs visible white and ultraviolet light and transmits infrared light. It is used in spectrometers and spectrophotometers which are optical instruments.
>
> The RG 830 is similar to the RG 9 and its use is the same; it differs in that it absorbs more visible light.
>
> With the exception of the KG 4, the various glass types are used in astronom-

ical instrumentation at the Kitt Peak National Observatory which is the United States' national center for groundbased optical astronomy.

*Schott II*, 7 CIT at 37–38, 587 F.Supp. at 70.

■ For the reasons that follow, the Court concludes not only has plaintiff failed to demonstrate the determination in *Schott I* was clearly erroneous, but in the spirit of *Stone & Downer*, in a proceeding which for all intents and purposes was a trial *de novo*, plaintiff has failed to overcome the presumption of correctness afforded the classification by Customs.

## DISCUSSION

It is useful, at this point, to discuss the principles of law pertaining to the presumption of correctness and the burden of proof in Customs classification cases.

■ In 1980, Congress enacted 28 U.S.C. § 2639(a)(1) which codified the well-settled principle of decisional law that in actions commenced in the Court of International Trade challenging the classification of imports, the decision of the administering authority is presumed correct. The burden of proving otherwise rests with the party challenging the decision. *See Stewart–Warner Corp. v. United States*, 748 F.2d 663 (Fed.Cir.1984); *Schott I*, 82 Cust.Ct. 11, C.D. 4783, 468 F.Supp. 1318 (1979). As a matter of law, as Chief Judge Re pointed out in *Schott I*, Customs is presumed to have found the existence of every fact necessary to support a classification determination. *See W.A. Gleeson v. United States*, 58 CCPA 17, C.A.D. 998, 432 F.2d 1403 (1970); *Novelty Import Co., Inc. v. United States*, 53 CCPA 28, C.A.D. 872 (1966); *F.H. Kaysing v. United States*, 49 CCPA 69, C.A.D. 798 (1962). The presumption of correctness attaches not only to the ultimate conclusion of the classification but also to every subsidiary fact necessary to support that conclusion. *Schott I*, 82 Cust.Ct. at 15, 468 F.Supp. at 1320.

■ The plaintiff has the burden of establishing the Government's classification is incorrect and that the claimed classi-

fication is correct. *Sanyo Elec. Inc. v. United States*, 84 Cust.Ct. 167, C.D. 4855, 496 F.Supp. 1311 (1980), *aff'd*, 68 CCPA 14, C.A.D. 1258, 642 F.2d 435 (1981). In deciding whether the presumption of correctness has been rebutted, the Court must consider whether the Government's classification is correct both independently and in comparison with the importer's alternative. *Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed.Cir.1984), *reh'g denied*, 739 F.2d 628 (Fed.Cir.1984); *Oak Laminates Div. of Oak Materials Group v. United States*, 8 CIT 175, 628 F.Supp. 1577 (1984), *reh'g denied*, 8 CIT 300, 601 F.Supp. 1031 (1984), *aff'd*, 783 F.2d 195 (Fed.Cir.1986).

It is clear this Court must presume the decision of Customs was correct as to every fact necessary to support the conclusion the imported glass products in dispute were properly classified as optical glass. Plaintiff may rebut this presumption and demonstrate the correctness of an alternative classification. Furthermore, this Court has observed:

> It is an established principle of customs law that if the meaning of a word in a tariff provision is in dispute, the correct meaning is to be determined from its common meaning, that is, from its commonly received and popular sense.... What constitutes the common meaning of a tariff term is not a question of fact, but a question of law to be decided by the court. In ascertaining and understanding the common meaning of a tariff term, the court may consult

dictionaries, scientific authorities and other reliable sources of information. *Schott I*, 82 Cust.Ct. at 16, 468 F.Supp. at 1321.

Renewing an argument made in *Schott I*, plaintiff refers to the Tariff Act of 1922 and contends all indications of congressional intent in the enactment of the tariff provisions for optical glass show an intent not to include colored filter glass as optical glass. Plaintiff further argues nothing in the legislative history shows an intent by Congress to change the definition of "optical glass." While plaintiff cites testimony at hearings and *The Summaries of Trade and Tariff Information* to support its argument, the Court deems this authority insignificant. *See Daw Industries, Inc. v. United States*, 714 F.2d 1140 (Fed.Cir. 1983); *Dodge & Olcott, Inc. v. United States*, 45 CCPA 113, 116, C.A.D. 683 (1958). An examination of the several legislative reports cited by Schott reveals Congress had neither a concern to define the term "optical glass" nor an intent to exclude colored filter glass from being encompassed by that term.[4]

The relevant provisions of the Tariff Acts of 1922 and 1930 contain different terminology from that which is at issue in this case. Although the former Tariff Acts limited optical glass to the *uses* in which it was employed, item 540.67 eliminates that restriction by a change of terminology. In this regard, the Court adopts the principle that: "[a] change in the language of a statute has always been construed ... to import a change in meaning unless the

---

**4.** Paragraph 227 of the Tariff Act of 1922 provided: "Optical glass or glass used in the manufacture of lenses or prisms for spectacles, or for optical instruments or equipment, or for optical parts, scientific or commercial, in any and all forms, 45 *per centum ad valorem.*" The Tariff Act of 1922, ch. 356, § 1, para 227, 42 Stat. 858, 873 (1922) (repealed 1930). The Senate Majority and Minority Reports do not discuss the meaning of "optical glass." *See* S.Doc. No. 595, 67th Cong., 2d Sess. (1922). Similarly, the House Report does not discuss the meaning of "optical glass." *See* H.R.Doc. No. 248, 67th Cong., 1st Sess. (1921). The Conference Report on the Specific Provision Concerning Optical Glass indicates only the House receded from disagreement on the tariff to be paid. *See* S.Doc. No. 253, 67th Cong., 2d Sess. (1922).

The Tariff Act of 1930 at Paragraph 227 provides: "Optical glass or glass used in the manufacture of lenses or prisms for spectacles, or for optical instruments or equipment, or for optical parts, scientific or commercial, in any and all forms, 50 *per centum per annum ad valorem.*" The Tariff Act of 1930, ch. 497, § 1, para 227, 46 Stat. 590, 607 (1930) (repealed 1962). At no place in the legislative history of the Act is there an attempt to arrive at a definition of the term "optical glass." *See* S.Doc. No. 138, 71st Cong., 2d Sess. (1930); H.R.Rep. No. 1326, 71st Cong., 2d Sess. (1930); S.Doc. No. 154, 71st Cong., 2d Sess. (1930); S.Doc. No. 158, 71st Cong., 2d Sess. (1930); S.Doc. No. 161, 71st Cong., 2d Sess. (1930); H.R.Rep. No. 1892, 71st Cong., 2d Sess. (1930); H.R.Rep. No. 1893, 71st Cong., 2d Sess. (1930).

contrary is made plainly to appear in other ways." *United States v. American Brown Boveri Electric Corporation*, 17 CCPA 329, T.D. 43776 (1929). As defendant points out, *The Tariff Classification Study* provides: "Item 540.67 covers: (1) Prisms and optical elements *other than lenses*, of glass not optically worked, now dutiable under ... as scientific articles of glass." *Schott I*, 67 CCPA at 34–35, 612 F.2d at 1285.

In *Schott I*, the court of appeals, in considering the common meaning of "optical glass," took note of this change. The court analyzed this change in light of the TSUS General Interpretive Rules provisions found in the General Headnotes and Rules of Interpretation section of TSUS which provides as follows:

(c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but, in applying this rule of interpretation, the following considerations shall govern:

(i) a superior heading cannot be enlarged by inferior headings indented under it but can be limited thereby;

(ii) comparisons are to be made only between provisions of coordinate or equal status, i.e., between the primary or main superior headings of the schedules or between coordinate inferior headings which are subordinate to the same superior heading....

TSUSA, General Headnotes and Rules of Interpretation, Headnote 10, Section C (1980).

The court of appeals stated that "it is clear that the meaning of 'other optical glass' in 540.67 cannot be broader than '[o]ptical glass in any form' in its superior heading. It is also clear that the phrase 'in any form' refers to the physical shape of the glass rather than to a material or quality of construction." *Schott I*, 67 CCPA at 34, 612 F.2d 1285.

The court of appeals in *Schott I*, after a lengthy analysis, concluded as follows:

In view of the foregoing, we are persuaded that the common meaning of "op-

tical glass" embraces the concept of "high quality" with respect to each of the various properties described above, absorption, refraction, polarization, etc. A criterion for determining "high quality" with respect to one property may apply exclusively to that property (*e.g.,* refractive index applies only to the refractive property) or may also apply in determining "high quality" with respect to other properties (*e.g.,* homogeneity applies to both the properties of absorption and refraction). When a glass is selected for a particular property, the proper inquiry is whether the glass is of high quality with respect to that property, and the quality with respect to other properties is immaterial.

In the case of glass in which the refraction property is critical, at least two criteria must be met.... "[O]ne is a very careful knowledge of the chemical composition, that means both the deliberate addition of the necessary chemicals and the guaranty in the processing that this intended composition is actually obtained. The second is the refractive index to the degree specified in a good optical glass is strongly affected by the way it is cooled down or annealed. The lack of knowledge or lack of patience in the time allowed for it could lead to serious deviations in the [refractive] index and even in the fourth [decimal] place."

In the case of glass in which the absorption property is critical, the degree of uniformity of color in the glass ("homogeneity") must be "very great," although ... you do not require that this homogeneity is to the numbers stated in an optical glass. Nevertheless ... [the glass should be] of very high or the highest quality available in glass chosen for its absorption property.

*Schott I*, 67 CCPA at 36–37, 612 F.2d at 1286–87 (citation omitted).

In urging the Court to reject the ruling in *Schott I*, Schott maintains that all earlier decisions have defined optical glass as refractory or colorless. Plaintiff cites nu-

merous cases which it contends support this position. The Court finds, however, after an examination of these decisions and other cases, a contrary conclusion is warranted.[5] Upon close scrutiny, the Court concludes the decisions support the ratio-nale of Chief Judge Re and the court of appeals in *Schott I* defining "optical glass."

■ Referring to other authorities such as dictionaries and scientific authorities, Schott urges that the classification of optical glass does not include color filter glass within the common meaning of the term.[6]

5. In *Semon Bache & Co. v. United States,* 25 CCPA 239, T.D. 49339 (1937), the court *held* that imported glass rods used in the manufacture of lenses for reflective buttons which were placed in signs or curves and crossings of roads as signals to reflect the light from automobile headlights, flash lights, and "cheap cameras" were not optical glass within the meaning of that term in paragraph 227 of the Tariff Act of 1930. This glass was not of high quality. The court held, in *Ednal Co., Inc. v. United States,* 6 Cust.Ct. 552, Abs. 45423 (1941), that colored sheet glass used as filters for cameras was not optical glass since only glass provided for under paragraph 227 of the Tariff Act of 1930 was glass used for the manufacture of lenses or prisms for optical instruments or equipment. The court ruled that a filter for a camera was not a lens or prism for a camera (cameras were treated as optical instruments). The court also determined optical glass was an extra fine quality of flint or crown glass used for telescopes, microscopes, camera lenses, scientific instruments of precision and not for spectacle lenses, and pressed lenses for which inferior glass was used. The court made no mention of the significance of the glass being colored. In *Bausch & Lomb Optical Co. v. United States,* T.D. 24150, 6 Treas.Dec. 32 (1903), the Appraisers interpreted an 1897 tariff statute and determined that glass used in the manufacture of refracting bodies for optical instruments and intended to be ground into prisms or lenses for optical instruments was duty free. This determination seemed to have been limited in its scope by the "use" provisions as provided by the statute at that time. While not discussing the properties or the definition of optical glass, the General Appraisers in *Wiswall & Tichenor v. United States,* T.D. 28804, 15 Treas.Dec. 188 (1908), determined that cylinder glass plates *colored or uncolored* which because of their high cost were not adapted commercially for glaziers' or decorative purposes and which were manufactured with special care for the purpose of rendering them suitable for use in the manufacture of optical instruments, spectacles, and eyeglasses were entitled to duty-free entry under the Tariff Act of 1897 as optical glass. The Appraisers determined that the cylinder glass plates were not dutiable as cylinder, crown, or common window glass. The Appraisers indicated that glass manufactured for optical purposes required special attention be given to the purity of materials used in its manufacture to secure freedom from bubbles, seeds, cords, and striae of all kinds. There was no indication such optical glass was free of color. In *Hammell, Riglander & Co. v. United States,* T.D. 25252, 7 Treas.Dec. 693 (1904), the Appraisers held unpolished rough cut or unwrought *colored optical* glass known as coquille glass was entitled to enter duty free under paragraph 565 of the Tariff Act of 1897 covering "Glass plates or discs, rough cut or unwrought, for use in the manufacture of optical instruments, spectacles, and eye glasses, and suitable only for such use." The Appraisers, in *R.F. Dowling & Co. v. United States,* T.D. 14644 (1894), determined that *uncolored and colored* unpolished cylinder glass of a special quality; expressly designed for use in the manufacture of optical instruments, spectacles and eyeglasses; and in the form suitable only for such use was entitled to duty-free entry under the Tariff Act of 1890.

6. One of the authorities cited by Schott includes the twelfth volume of the *Encyclopaedia Britannica.* This authority enumerates the qualities of optical glass as transparency and freedom from color, homogeneity, hardness and chemical stability, absence of internal strains, and refraction and dispersion. The description also provides that "[i]t is, in fact, admitted that some glasses, most useful optically, the dense barium crown glasses, which are so widely used in modern photographic lenses cannot be produced entirely free either from noticeable colour or from numerous small bubbles.... In practice ... it is not found that the presence of a decidedly greenish-yellow colour ... interferes at all seriously with the successful use of the lenses ... so that it is preferable to sacrifice the perfection of the glass *in order to secure valuable optical properties.* XII *Encylopaedia Britannica* 88 (11th ed. 1910) (emphasis added). In the tenth volume of *Encyclopaedia Britannica,* optical glass is discussed as the highest quality of glass used for telescopes, microscopes, and camera lenses, and not for spectacle lenses for which inferior glass is used. The passage indicates that "[o]ptical glass is always purchased on specification and must be supplied as having a definite refractice [sic] index ... [and is used in] lens systems in instruments without colour fringes." X *Encyclopaedia Britannica* 417–18 (14th ed. 1929). In *Semon Bache & Co. v. United States,* 25 CCPA 239, 242, T.D. 49339 (1937), the court indicated the *Encyclopaedia Britannica* set forth optical glass as a term usually regarded as applying to the highest quality of glass for telescopes and microscopes and not to spectacle lenses for which inferior glass was used. There was no discussion as to color. The *Encyclopaedic Dictionary of Physics* pro-

Although some of the definitions cited by plaintiff seem inconsistent, others clearly indicate a characteristic of optical glass is freedom from color. With regard to optical glass used for lenses and prisms in microscopes, telescopes, and cameras, exact specifications of refraction and dispersion, high quality, and the absence of color are all important characteristics. On the other hand, with respect to *other types* of optical glass, where the property of absorption is significant, color and the degree of uniformity of that color in the optical glass (homogeneity), are important characteristics. The Court, therefore, holds the mere presence of color in glass does not by itself preclude the glass from being classified as optical glass under item 540.67 of the TSUS.

As pointed out by the Government in its brief, item 540.67 is an *eo nomine* designation of the term "optical glass." An *eo nomine* designation includes all forms of the article, depending upon any limitation of contrary legislative intent, judicial determination, administrative practice, or commercial designation. *Nootka Packing Co. v. United States*, 22 CCPA 464, T.D. 47464 (1935). It seems clear Congress has not treated optical glass in a restrictive sense. *See supra* n. 4.

At the trial in the instant action, Schott introduced the testimony of one of its employees, Dr. Marker, who was in charge of research, quality control, and technical services for the customers of Schott. Dr. Marker testified about the colored optical glasses sold by Schott which were intended for use in the infrared and ultra violet regions of the optical spectrum. Dr. Marker's testimony included the following exchange:

Q. Are you certain of Schott's [sic] optical, what you consider optical glass, glasses intended for use in the infrared and ultra violet regions of the optical spectrum?

A. Yes.

\* \* \* \* \* \*

Q. How about infrared transmitting glass, is that something that you are familiar with.

A. Somewhat, yes.

Q. Does Schott's [sic] produce that glass?

A. Yes.

Q. Is that an optical glass, as far as you know?

A. Yes, it would be considered an optical glass.

\* \* \* \* \* \*

vides with respect to optical glass that "[t]he raw materials used in its production are so selected as to ensure the optimum light transmission ... consistent with composition necessary to produce the desired optical constants.... Most metallic oxides, at low concentrations, can colour glass, and hence the manufacturer finds it necessary to use only the purest of raw materials. The same principle is followed in making optical colour filters in order to control the colours required...." *Encyclopaedic Dictionary of Physics* 213 (1962). The *Funk & Wagnalls Standard College Dictionary* defines optical glass as: "High quality glass specialized in refractive and dispersive powers for lenses." *Funk & Wagnalls Standard College Dictionary* 948 (1968). It is silent as to the absence of color. In *Funk & Wagnalls Standard Dictionary of the English Language*, optical glass is referred to in a similar fashion; the text is silent as to color as a characteristic. I *Britannica World Language Edition of Funk & Wagnalls Standard Dictionary* 536 (1963).
The *International Dictionary of Physics and Electronics* indicates optical glass is used in "lenses, prisms ... as distinguished from mirrors, [and]

must be.... [free of] bubbles, striae, [and] seeds...." It is silent as to color. The *International Dictionary of Physics and Electronics* 629–30 (1956). The *Military Standard Optical Terms and Definitions* defines "glass, crown" as: "A *type* of *optical glass* of the alkali-lime-silica type," with an index of refractor in the 1.5 to 1.6 range and an *Abbe constant* in the 64 to 57 range. "Glass, flint" is also defined as another *type* of optical glass to which lead and other elements are added to produce a higher index of refraction and a lower *Abbe constant.* "Glass, optical" is defined as glass which is carefully controlled with respect to composition melting, heat, and transmittance in order to obtain optical characteristics such as its index of refraction, dispersion, transmitance, spectral transmittance, and freedom from birefringence. The text is silent as to color. The *Military Standard Optical Terms and Definitions* 25 (Dep't of Defense 1967). The *New Encyclopaedia Britannica* indicates optical glass must be homogeneous of high purity and free from colour and underlines the importance of the indicies of refraction and dispersion. VIII *New Encyclopaedia Britannica* 211 (15th ed. 1982).

Judge Carman: Can you have infrared transmitting glass that is optical?

A. Yes. The chalcodinide glasses would be optical glass.

Judge Carman: And what color are they?

A. They are—they would appear to the eye to be black, but if I look at there [sic] transmission curve, once they turn-on, they would look like the transmission curve for any other optical glass—that is, it would show no internal structure; it would turn on, go all the way across the longwave length and then turn-off.

Judge Carman: What makes it happen that way?

A. That, again is a fundamental nature of the components that are in the glass.

Judge Carman: Even though it's colored black?

A. Even though it's colored black. It still has in its window, its optical glass. It has, now, the characteristics of optical glass; it's controlled for index and dispersion when it's manufactured. The only thing is, due to the electronic structure of the components in its formulation, they have a structure such that they're [sic] absorption is all through the visible, so to you it looks black.

*August 14th Notes of Testimony* at 1164, 1179, 1184–1185, *Schott Optical Glass, Inc. v. United States*, Court No. 81–01–00030.

Schott's witnesses, Pye, Sislen, and Modne also testified that some optical glasses are used in the ultraviolet and or infrared, region of the optical spectrum. Dr. Kreidl, another witness of Schott, testified he knew of optical glass that was black. Apart from other evidence, Schott's own witnesses establish the proposition that in the commonly received and popular sense, absence of color is not a prerequisite for the classification of optical glass.

Schott's witness, Mr. Moore, conceded the American Ceramics Society is the principal professional organization specializing in the science of glass in the United States. The *Standard Definitions of Terms Relating to Glass and Glass Products* of the *American Society for Testing and Materials*, (ASTM), a text published in joint promulgation with the ASTM and The American Ceramics Society, defines optical glass as follows: "glass of high quality having closely specified optical properties used in the manufacture of optical systems." Brief for the United States, Defendant at 9, *Schott Optical Glass, Inc. v. United States*, Court No. 81–01–00030. This definition contains no requirement for lack of color. The standard, moreover, is reviewed regularly. Schott's witness, Dr. Marker, also testified the color filter glasses in this case meet the ASTM standard.

The Government's exhibit (DX) 20, is an envelope which shows that the National Bureau of Standards (NBS) received numerous sets of color filter glasses from one of Schott's distributors. The sets were received prior to the decisions in *Schott I.* The envelope is clearly marked "optical glass filters."

Schott's exhibit (PX) 9(g) is a sample of one of the color filters in this case, UG 5. The sample is contained in an envelope marked "Schott Optical Glass."

DX 17 is an excerpt from a catalogue of one of the distributors of Schott's color filter glasses. The excerpt describes the glasses as "made from the highest quality Schott colored optical glass." While conceding the language was changed in later editions of the catalogue, the Government points out in its brief that the revision occurred subsequent to the decision in *Schott I.*

DX 4 is an undated color filter glass catalogue of Schott. The catalogue describes Schott's color filter glass as: "homogenous pieces of colored optical glass [which] are now available in relatively large sizes and thickness." The Government points out in its brief that this document was produced prior to 1975 since it was also an exhibit in *Schott I.*

DX 5 is also an undated edition of Schott's color filter glass catalogue which describes the glass as: "homogeneous pieces of colored optical glass ... available in relatively large sizes and thickness."

PX 1(E) is an optical glass catalogue that indicates cerium is added to optical glass to

increase its absorption properties for protection when exposed to gamma radiation. Dr. Kriedl, one of Schott's witnesses, testified the addition of cerium frequently shows some absorption at short wave lengths since the cerium addition causes a slightly yellowed appearance.

The record is replete with evidence that demonstrates color filter glass has been commonly and popularly known, advertised, described, purchased, and sold as optical glass. The stipulation of uncontested findings of fact entered into by the parties provides as follows:

> 17. The WG 345 glass transmits the visible (to the naked eye) and absorbs specific wavelenghts [sic] of radiation in the ultraviolet region of the electromagnetic spectrum. The WG 345 glass appears clear or colorless to the naked eye.
>
> 18. WG 345 is glass which as [sic] a transmittance of normally incident light of more than .66 percent at all wavelengths from 400 to 700 millimicrons, inclusive, and a transmittance of more than 80 percent at all wavelengths from 525 to 575 millimicrons, inclusive, for glass ¼ inch thicknss [sic], or of the equivalent transmittances for any other thickness.

Uncontested Findings of Fact at 3, *Schott Optical Glass, Inc. v. United States*, Court No. 81–01–00030. WG 345 is also used in solar filter simulators which are optical instruments. *Schott II*, 7 CIT at 38, 587 F.Supp. at 70.

After close study of the entire record in this case, the Court finds all of the subject filter glass is of a very high quality, used for optical instruments, and capable of performing optical functions. The Court finds Schott has failed to overcome the presumption of correctness which attached to the Customs' classification of the imported glass as optical glass. Schott has thus failed to establish the imported glass products should not have been included as optical glass within the meaning of 540.67 TSUS.

The protest is therefore overruled. Judgment for the Government will be entered accordingly.

## JUDGMENT

This case, having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED, and DECREED that the classifications of the United States Customs Service are hereby affirmed; and it is further

ORDERED, ADJUDGED, and DECREED that the protest is overruled and this action is hereby dismissed.